[S.F. No. 24599. Mar. 4, 1985.]

ARTHUR ROBBINS et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
COUNTY OF SACRAMENTO et al., Real Parties in Interest.

200

---

---

**COUNSEL**

Melinda R. Bird, Marilyn K. Katz, Alan Rader, Jeffery Ogata, Roberta Ranstrom, Eugene T. Moriguchi and Katherine Meiss for Petitioners.

Rocky Unruh, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Margo Anne Feinberg, Nancy Reardan, John Huerta and Linda Wong as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

L. B. Elam, County Counsel, J. Steven Burris and Lilly C. Frawley, Deputy County Counsel, for Real Parties in Interest.

Kenneth L. Nelson, County Counsel (Santa Barbara), Marvin Levine, Chief Assistant County Counsel, Ronald A. Zumbrun, John H. Findley, Timothy D. Taron, Hefner, Stark & Marois, Richard J. Moore, County Counsel (Alameda), and Lorenzo E. Chambliss, Deputy County Counsel, as Amici Curiae on behalf of Real Parties in Interest.

OPINION

BIRD, C. J.—Does a county violate Welfare and Institutions Code section 17000 et seq. or the California Constitution when it requires its residents who are single, employable and eligible for general assistance benefits to live in a county facility in lieu of cash benefits?

I.

Petitioners (plaintiffs) are 20 single, employable residents of the County of Sacramento (County) who are eligible for general assistance benefits,[1] the California Coalition of Welfare Rights Organizations, and the Depression Survival Action Committee. Real parties in interest (defendants) are the County, the County board of supervisors and its members, and the County department of social welfare and its director.

This lawsuit challenges the County's general assistance program which precludes eligible residents who are single and employable from receiving cash grants. Instead, the program offers them "in-kind" benefits—food and shelter at a County-run facility.

Pursuant to its statutory duty,[2] the County established a general assistance program for its indigent residents. Until 1982, all eligible County residents received benefits in the form of cash grants, regardless of their marital status or employability.

In August of that year, the County board of supervisors (Board) passed a resolution[3] which enabled the department of social welfare to replace cash grants with "in-kind" benefits for single and employable applicants.[4] Effec-

---

[1]Eligibility for County general assistance benefits is determined pursuant to Welfare and Institutions Code sections 17100-17111 and chapter 2 of the Sacramento County General Assistance Policies.

[2]Section 17000 of the Welfare and Institutions Code provides: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

All subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3]By Resolution 82-967, the Board added or revised sections 19, 20, 35, 39, 48, 50, 64-68 and 73 of the Sacramento County General Assistance Policies.

[4]There are several enumerated exceptions: (1) where a dependent child under the age of 18 lives with the applicant; (2) where the applicant has a verified physical or mental incapacity; (3) where the applicant is non-English speaking; or (4) where the applicant is a homeowner.

Applicants who would otherwise meet the requirements for receipt of "in-kind" benefits receive cash grants if the Bannon Street facility has no vacancies.

tive October 1, 1982, such applicants were given the choice of either residing in the County's Bannon Street emergency shelter or foregoing benefits.[5]

Although the parties disagree about the living conditions at the Bannon Street facility,[6] the basic facts are not in dispute.

The Bannon Street facility houses up to 67 men and women. These residents sleep in dormitories with shared toilet facilities.[7] The dormitories are open, with no private rooms, alcoves or dividing walls.

Residents may not enter the facility or the women's dormitory without staff permission. There are scheduled thirty-minute meal periods three times a day and alcoholic beverages are prohibited. Telephone use is limited to a pay phone in the lobby. A "bedcheck" is conducted each night at 9 p.m., and each resident is required to be present at that time.[8] No one may leave the facility after bedcheck.[9]

The original complaint challenging the County's "in-kind" benefits policy was filed in December 1982. Plaintiffs filed an amended complaint on March 2, 1983, in which they sought a preliminary injunction. Defendants filed a general demurrer. The trial court overruled the demurrer and denied the motion for a preliminary injunction.

Plaintiffs now seek a writ of mandamus directing the trial court to enter an order granting the request for a preliminary injunction.[10]

---

[5]New sections 64 to 68 govern the County's "in-kind" benefits policy.

Section 66 provides: "If an applicant or recipient (at the time of redetermination) refuses to accept available benefits offered, no form of aid shall be provided for thirty (30) days."

[6]The parties have submitted numerous declarations which describe the Bannon Street facility in great detail. To summarize, plaintiffs' declarations describe the facility as a place where the food is "terrible, cold and inadequate," the bathrooms are "unsanitary," theft and violence are common occurrences, and daily life is "humiliating and degrading." The facility is like a "jail for poor people." In sharp contrast, the County has characterized the Bannon Street facility as a "clean, well-organized facility with a friendly, caring and cooperative atmosphere" where "the rules and regulations do not restrict the freedoms of the residents . . . except in very mild form."

[7]The dormitories and toilet facilities are segregated by sex.

[8]There is a relaxation of the bedcheck rule for residents participating in the work project program. These residents may be exempted if they notify the front desk either before leaving the facility on any given day or if they telephone before 9 p.m. Work project participants may also stay away from the facility on weekends if they comply with the same notification rule.

[9]The parties agree that these rules may be flexibly enforced although they may not be totally disregarded.

[10]This court issued an order on June 30, 1983, precluding the department of social welfare and its director from conditioning receipt of general assistance benefits upon residence at the Bannon Street facility pending determination of plaintiffs' petition for hearing. On July 27, 1983, this court granted plaintiffs' petition and issued an alternative writ. That order also extended the previously ordered stay "pending final determination of this matter."

Mandamus is issued "to compel the performance of an act which the law specially enjoins . . . ." (Code Civ. Proc., § 1085.) ■ Although mandamus does not generally lie to control the exercise of judicial discretion, the writ will issue "where, under the facts, that discretion can be exercised in only one way." (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666].) ■ If, on the basis of undisputed facts, it is clear that the trial court abused its discretion in failing to issue the preliminary injunction, a writ of mandamus to compel issuance of the injunction is appropriate. (See *State Farm etc. Ins. Co.* v. *Superior Court* (1956) 47 Cal.2d 428, 432 [304 P.2d 13] ["[m]andate lies to control judicial discretion when that discretion has been abused"]; see, e.g., *Pacific Indem. Co.* v. *Superior Court* (1966) 246 Cal.App.2d 63, 72 [54 Cal.Rptr. 470] [in which the Court of Appeal issued a writ of mandate to compel issuance of the preliminary injunction after the trial court abused its discretion in denying the injunction].)

■ Mandamus is appropriate "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.) Although the denial of a preliminary injunction is an appealable order (Code Civ. Proc., § 904.1, subd. (f); *Brydon* v. *Hermosa Beach* (1928) 93 Cal.App. 615, 620 [270 P. 255]), this court necessarily determined that appeal was not an adequate remedy when it issued the alternative writ (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 945 [92 Cal.Rptr. 309, 479 P.2d 669], cert. den., 401 U.S. 1012 [28 L.Ed.2d 549, 91 S.Ct. 1266]; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593]).

## II.

■ The issue before this court is whether the trial court abused its discretion in denying plaintiffs' motion for a preliminary injunction. ■ Although the trial court has broad discretionary powers to grant or deny a request for a preliminary injunction, it has "no discretion to act capriciously." (*Gosney* v. *State of California* (1970) 10 Cal.App.3d 921, 924 [89 Cal.Rptr. 390].) It must exercise its discretion "in favor of the party most likely to be injured." (*Ibid.*; *Riviello* v. *Journeymen Barbers etc. Union* (1948) 88 Cal.App.2d 499, 510 [199 P.2d 400].) If the denial of an injunction would result in great harm to the plaintiff, and the defendants would suffer little harm if it were granted, then it is an abuse of discretion to fail to grant the preliminary injunction. (*Riviello* v. *Journeymen Barbers etc. Union, supra,* 88 Cal.App.2d at p. 510; *Ellis* v. *American Federation of Labor* (1941) 48 Cal.App.2d 440, 446 [120 P.2d 79]; see also *Isert* v.

*Riecks* (1925) 195 Cal. 569, 576 [234 P. 371]; *Gosney, supra,* 10 Cal.App.3d at p. 924.)

■ The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889]; *U.S. Hertz, Inc.* v. *Niobrara Farms* (1974) 41 Cal.App.3d 68, 79 [116 Cal.Rptr. 44].) " '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' " (*Continental Banking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528; accord *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 70.)

■ There is basic agreement as to the following facts: 1) the Bannon Street facility has a maximum occupancy of 67 residents; and 2) the County provides general assistance benefits to over 4,000 of its residents.[11] It would appear that less than 2 percent of the general assistance program would be affected by the injunctive relief sought by plaintiffs. Therefore, the potential harm to the program is apparently far less substantial than defendants claim.

However, defendants argue that an order to remove general assistance recipients from the Bannon Street facility would adversely affect both the performance of the County's contract with the Volunteers of America, which operates the facility, and the interests of the Bannon Street residents, who would be forced to find shelter and food elsewhere.

Since plaintiffs do not ask for the closure of the facility, it is unclear why the granting of an injunction would have such extreme consequences. Plaintiffs seek injunctive relief to "prevent Sacramento County from *requiring* some of its indigent residents to live in a poorhouse and to require Sacramento County to provide all persons eligible for general assistance with its cash grant aid *if they so desire.*" (Italics added.) Thus, plaintiffs are not seeking to close the Bannon Street facility, but merely to make residence a voluntary alternative to cash grants. Defendants fail to show how this injunctive relief would impair the performance of the County's contract or harm the current residents of the facility.

---

[11]The most recent statistics proferred by defendants indicate that the County provided general assistance benefits to 4,262 residents in July 1982, 4,394 residents in August 1982, and 4,403 residents in September 1982.

In contrast to the minimal and speculative harms defendants allege, plaintiffs claim that they will suffer substantial and immediate harm by the continued operation of the "in-kind" benefits policy. Absent injunctive relief, plaintiffs will be left with the painful choice either to give up their privacy and their control over fundamental aspects of their lives or to endure the hardship of subsisting without income or general assistance benefits. Either "alternative" will cause plaintiffs great harm.

The decision to live in the regimented Bannon Street facility requires many personal sacrifices. Even if the court were to overlook the psychological impact and physical danger that plaintiffs allege accompany residence at the facility, the loss of control over a wide range of personal decisions cannot be ignored. Residents of the facility no longer decide when or with whom they eat, dress, bathe, and sleep. They have no control over what and when they eat. They are not allowed to decide when and where they will have visitors.[12] In short, the residents forego the privacy other citizens enjoy.

In addition, uprooting a person from familiar surroundings and placing him in the facility may cause other, more intangible harm. For example, forced residency with strangers who share only poverty, marital status and the ability to work, may create emotional strain. A social stigma may also attach to those housed at the facility.

The "alternative" offered plaintiffs poses a different, though equally serious problem. Those who decide to maintain their own lifestyles and to associate with whomever they choose are denied general assistance benefits. Clearly, most eligible individuals cannot readily forego public benefits. General assistance is usually a last resort. To be eligible, a resident must have no income, no savings or resources, and no financial support from family or friends. Such a person would inevitably suffer substantial hardship if forced to live without general assistance benefits until this lawsuit is resolved on the merits.

Plaintiffs will suffer great and immediate harm from the denial of the requested injunction. The alleged harm to defendants is minimal. Plaintiffs have met the first prong of the test for issuance of a preliminary injunction. The second prong is the likelihood of success on the merits. (See *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 69-70.)

---

[12]Despite these restrictions on the ability of Bannon Street residents to make fundamental decisions about their daily lives, the dissent ignores the record and argues that the residents, "in general, exercise complete control over their lives." (*Post,* at p. 224.)

Plaintiffs contend that the County's "in-kind" benefits policy violates both statutory and constitutional law. The statutory challenge is based primarily upon the provisions of section 10000. That section outlines the statutory purpose and legislative intent of division 9 (§§ 10000-18971), which contains the provisions governing county general assistance programs (§§ 17000-17410). "The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that *aid shall be administered and services provided promptly and humanely, with due regard for the preservation of family life, and without discrimination on account of* race, national origin or ancestry, religion, sex, *marital status,* or political affiliation; *and that aid shall be so administered and services so provided,* to the extent not in conflict with federal law, *as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society.*"[13] (§ 10000, italics added.)

Plaintiffs contend that the County's "in-kind" benefits policy fails to meet this statutory standard because it forces an "inhumane" choice upon those County residents to whom it applies. They argue that making residency at the Bannon Street facility a condition of the receipt of benefits robs the affected applicants of their individuality and dignity. Rather than "encourag[ing] self-respect [and] self-reliance" (§ 10000), the County's program actually does the opposite—it leads to greater dependence upon the state, and it diminishes self-esteem.[14]

■ As this court recognized in *County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 401 [179 Cal.Rptr. 214, 637 P.2d 681], the courts play an important role in assuring that the provisions of the public welfare laws are liberally interpreted and actively enforced.

---

[13]The provisions of section 10000 were formerly contained in section 19, which was added to the code in 1947. (Stats. 1947, ch. 161, § 1, p. 690.) Although this section was enacted to "declar[e] the legislative intent in respect to the purpose of the Welfare and Institutions Code" (*ibid.*), it was not added to the code until 14 years after the enactment of the provisions now contained in section 17000 and many of the other provisions governing county aid to indigents. (See Stats. 1933, ch. 761, §§ 1-10, pp. 2005-2009.) The legislative history *does not indicate why the Legislature decided that such a statement of statutory purpose was* necessary at the time section 19 was enacted. Accordingly, this court must rely on the plain meaning of the terms of section 10000 in implementing the provisions of division 9. (See *Estate of Richartz* (1955) 45 Cal.2d 292, 294 [288 P.2d 857]; *Behling* v. *County of Los Angeles* (1956) 139 Cal.App.2d 684, 687 [294 P.2d 534]; *Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 768 [114 Cal.Rptr. 571].)

[14]The definition of "humane" is as follows: "marked by compassion, sympathy or consideration for other human beings." (Webster's New Internat. Dict. (3d ed. 1961) p. 1100.) "Self-reliance" is defined as "reliance upon one's own efforts, judgment or ability." (*Id.,* at p. 2061.) "Self-respect" is defined as "a confidence in one's own worth as a human being and a concern to maintain it." (*Ibid.*)

" 'A sound public policy prompts the efforts of the state to preserve the self-reliance of its citizens, even if at extra expense. . . . The state recognizes that many of its citizens are indigent, but it still wishes them to be independent. The relief legislation was enacted with that purpose in view. . . . The evolution of public welfare has been from public "charity" towards social justice. Courts should facilitate such development by an enlightened and liberal interpretation of all welfare laws.'." (*Id.*, quoting from *Industrial Commission of Ohio* v. *McWhorter* (1934) 129 Ohio St. 40 [1 Ohio Ops. 353, 193 N.E. 620, 622-623, 96 A.L.R. 1150].)

On this record, plaintiffs have demonstrated that the County's policy violates the goals of the state's welfare laws as reflected in section 10000. The County does not "humanely" promote "self-reliance" or "self-respect" when it compels its impoverished residents to give up their living quarters and control over their daily lives in exchange for residence in a rigidly regulated facility. Even if the facility were as clean, the food as nutritious and the rules as reasonable as the County contends, the residence requirement itself discourages self-reliance. It compels those who are designated for receipt of "in-kind" benefits to eat, drink, sleep, bathe and socialize according to a rigid schedule, under restrictive rules of conduct, and with people not of their own choosing.

As to those eligible persons who refuse to live in the Bannon Street facility, the County's policy can scarcely be characterized as "humane." When an eligible applicant is denied benefits, he may become "self-reliant" in the sense that the County no longer provides for him. However, the price of this self-reliance may be severe deprivation. Several of the plaintiffs' declarations indicate that rejection of the County's "offer" of "in-kind" benefits has left them destitute and homeless.

Neither "option" offered by the County's policy comports with the statutory purposes and legislative intent set forth in section 10000. Indeed, the very fact that the County forces eligible residents to face such a grim choice, when they are already in desperate straits, suggests that the program is not being humanely administered. Plaintiffs have established, as they did before the trial court, a strong likelihood that they will prevail on the merits of their statutory claims.

Defendants assert a variety of arguments in defense of the policy. First, they contend that " 'strivings toward independence are actually increased by the mild adversity' of the Bannon Street facility." To support this contention, the County points out that "in-kind" recipients receive general assistance benefits for an average of only 29 days as compared to the 9.3-month average for cash grant recipients.

This is clearly not the kind of "encouragement" the Legislature intended. A county does not fulfill its statutory mandate to "relieve and support" its indigents by forcing them into such adverse conditions that they either refuse the type of aid provided or leave because they cannot tolerate its deprivations. This argument is similar to those advanced in support of the poor laws and poorhouses. As one commentator has noted: "Annoying and tyrannical conditions will keep some eligible people from applying for benefits. This was clearly the point of many restrictions built into 19th-century poor laws. Welfare had to be a painful last resort." (Friedman, *Social Welfare Legislation: An Introduction* (1969) 21 Stan.L.Rev. 217, 229, fns. omitted (hereafter *Welfare Legislation*).) Fortunately, the standards of minimally acceptable treatment of the poor have evolved over the centuries. The courts must enforce the counties' duty to "encourage self-reliance" in a "humane" manner consistent with modern standards.

Defendants also contend that all forms of "in-kind" aid place restrictions on personal choice. Since "in-kind" aid is generally accepted by the courts, they argue that such restrictions cannot be held to violate the requirement that general assistance be administered humanely.

Defendants miss the point. Plaintiffs are not challenging all "in-kind" aid, nor are they contesting the validity of every form of general assistance that restricts choice.[15] Rather, plaintiffs challenge only those "in-kind" benefits that result in the loss of privacy and choice that placement at a County institution for the poor entails.

The various forms of "in-kind" benefits differ substantially in their impact on an individual recipient's freedom.[16] "In-kind" aid requiring residency at the Bannon Street facility is a far more pervasive restriction on the recipient's freedom of choice than the restriction found in other types of "in-kind" aid, for example, food stamps. Defendants' suggestion that plaintiffs seek the invalidation of all "in-kind" general assistance benefits is unfounded.

Defendants cite section 17002 as statutory authority for their actions. That section provides that the "boards of supervisors may establish almshouses and county farms, prescribe rules and regulations for their government and

---

[15]Plaintiffs concede that "in-kind" benefits such as food stamps, medical benefits, and conventional public housing are valid.

[16]Plaintiffs' position has been expressed aptly by one commentator as follows: "[c]ash gifts . . . maximize choice; gifts in kind do not. Yet a free-lunch program is not necessarily coercive or oppressive. There are goods and services almost anybody would voluntarily choose to buy, or at least not object to. On the other hand, some benefits appeal only to a few or to a special group of people. These can be left wholly voluntary . . . ." (Friedman, *Welfare Legislation, supra,* at p. 241, fn. 59.)

management, and appoint the necessary officers and employees thereof, who shall hold office during the pleasure of the board." Although this provision may permit counties to establish almshouses, it does not, on its face, provide authority for conditioning receipt of benefits upon residency in such a facility. Further, section 10000 by its own terms applies to section 17002. (See *ante,* pp. 207-208.) A policy requiring residency in a poorhouse is no more "humane" or likely to "encourage self-respect [and] self-reliance" when it is enacted under section 17002 than when it is enacted under the general mandate of section 17000.[17]

Finally, defendants argue that county supervisors have sole discretion to determine who is eligible for indigent relief, the type and amount of relief to be received, and the conditions to be attached to such relief. Section 17001 provides that "[t]he board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county." ▇ The case law addressing this provision has recognized that section 17001 confers broad discretion upon the counties in performing their statutory duty to provide general assistance benefits to needy residents. (See, e.g., *Berkeley* v. *Alameda County Board of Supervisors* (1974) 40 Cal.App.3d 961, 971 [115 Cal.Rptr. 540]; *Adkins* v. *Leach* (1971) 17 Cal.App.3d 771, 778-779 [95 Cal.Rptr. 61]; *Patten* v. *County of San Diego* (1951) 106 Cal.App.2d 467, 470 [235 P.2d 217].)

However, there are clear-cut limits. " 'This discretion . . . can be exercised only within fixed boundaries. In administering general assistance relief the county acts as an agent of the state. [Citation.] When a statute confers upon a state agency the authority to adopt regulations to implement, interpret, make specific or otherwise carry out its provisions, the agency's regulations must be consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose. [Citation.]' " (*City and County of San Francisco* v. *Superior Court* (1976) 57 Cal.App.3d 44, 49 [128 Cal.Rptr. 712], quoting *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231].)[18]

---

[17]Section 17000 provides that "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions."

[18]"Depression-stimulated questions about the constitutionality of the Elizabethan poor law system in California and persistent county claims of quasi-sovereign autonomy in the whole welfare field [have been] judicially settled. Though counties are admittedly distinct units of local government under the California constitution and, in providing for the maintenance and care for the poor, discharge a largely discretionary function, they are not independent agencies of government exerting a constitutionally vested authority. They are governed by

The courts have consistently invalidated city and county welfare regulations that fail to meet statutory requirements. (See, e.g., *Mooney* v. *Pickett, supra,* 4 Cal.3d 669; *City and County of San Francisco* v. *Superior Court, supra,* 57 Cal.App.3d 44.) "We have no doubt that when statutes affecting the well-being—perhaps the very survival—of citizens of this state are being violated with impunity by the [county], an agent of the state, the courts, as final interpreters of the law, must intervene to enforce compliance." (*City and County of San Francisco, supra,* 57 Cal.App.3d at p. 50; *Mooney* v. *Pickett, supra,* 4 Cal.3d at pp. 679-680.)

■ With respect to the statutory challenge, plaintiffs have satisfied the second prong of the preliminary injunction test. They have presented a persuasive argument that their statutory challenge will succeed at trial.[19] Defendants have offered only a weak defense of the County's policy.

Plaintiffs also contend that defendants' "in-kind" benefits program violates their constitutional right to privacy. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and *pursuing and obtaining* safety, happiness, and *privacy.*" (Italics added.)

The right to privacy was added to the California Constitution by the voters in 1972. The ballot pamphlet, which was distributed to the voters prior to the election, stated that the constitutional right to privacy encompassed a variety of rights involving private choice in personal affairs. "The right to privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose. . . . [¶] . . . . The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth, and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling public need." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) p. 27.)

■ This court has recognized that the "principal 'mischiefs'" at which the constitutional amendment was directed were the uncontrolled collection

---

the general law of the state and act as an 'agent of the state,' carrying out 'a matter of statewide interest' under the indigent statutes." (tenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status* (1964) 16 Stan.L.Rev. 900, 943.)

[19]The fact that the County's "in-kind" benefits policy applies only to single eligible residents suggests that the policy may violate the provision of section 10000 that prohibits discrimination on the basis of marital status. This issue was not addressed by the parties.

and use of personal information gathered by government and business interests. (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) However, the right to privacy has been held to protect a diverse range of personal freedoms. (See, e.g., *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779, 909 A.L.R.4th 118] [right of procreative choice]; *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89 [130 Cal.Rptr. 375] [right of unmarried person to cohabit].)

In *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 130, 134 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219], the right to privacy was held to encompass the right to choose the people with whom one lives. (See also *Welsch* v. *Goswick* (1982) 130 Cal.App.3d 398, 409-415 [181 Cal.Rptr. 703] (conc. opn. of Staniforth, J.).) The court stated that the constitutional amendment was intended "to ensure a right to privacy not only in one's family but also in one's home." (27 Cal.3d at p. 130, fn. omitted.) Moreover, the "[f]reedom to associate with people of one's choice is a necessary adjunct to privacy in the family and the home." (See *People* v. *Katrinak* (1982) 136 Cal.App.3d 145, 153 [185 Cal.Rptr. 869].)

██ Plaintiffs argue persuasively that the County's "in-kind" benefits policy infringes upon their constitutional right to privacy. Residence at the Bannon Street facility compels the individual to give up his home and the ability to choose his associates. He is forced to live in a particular location without the freedom to choose his own living companions. Further, an acute loss of personal privacy is inevitable where residents sleep in dormitories, eat in a cafeteria, use the same bathrooms, and live according to institutionally prescribed rules of conduct.

██ When receipt of a public benefit is conditioned upon the waiver of a constitutional right, the "government bears a heavy burden of demonstrating the practical necessity for the limitation." (*Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 505 [55 Cal.Rptr. 401, 421 P.2d 409].) The governmental entity seeking to impose such a condition must establish that: (1) the condition reasonably relates to the purposes of the legislation which confers the benefit; (2) the value accruing to the public from imposition of the condition manifestly outweighs any resulting impairment of the constitutional right; and (3) there are no available alternative means that could maintain the integrity of the benefits program without severely restricting a constitutional right. (*Committee to Defend Reproductive Rights* v. *Myers, supra*, 29 Cal.3d at pp. 265-266; *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 271 [57 Cal.Rptr. 623, 425 P.2d

223]; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d at pp. 501-502, 505-507.)[20]

 Defendants identify four state interests which they allege are furthered by the County's "in-kind" benefits policy. The first is an interest in improving the quality of the aid given eligible recipients. Defendants assert that residents of the Bannon Street facility receive three balanced meals a day and are provided with shelter, a pay telephone and a bus pass. They argue that persons receiving cash assistance "often buy non-essential items, live in substandard housing, and lack adequate access to transportation, telephones, and recreational facilities."

---

[20]The doctrine of "unconstitutional conditions" provides a clear standard. (See *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d 252; *Parrish* v. *Civil Service Commission, supra,* 66 Cal.2d 260; *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499.) Nevertheless, the dissent repeatedly misapplies it.

When a governmental entity conditions receipt of a public benefit upon forfeiture of a constitutional right, the governmental entity must establish, inter alia, that there are no alternatives less subversive of the constitutional right. (*Myers, supra,* 29 Cal.3d at pp. 265-266; *Parrish, supra,* 66 Cal.2d at p. 271; *Bagley, supra,* 65 Cal.2d at pp. 501-502.) However, the dissent fails to cite any evidence presented by the County regarding the feasibility or restrictiveness of any specific alternatives. Instead, the dissent summarizes the package of benefits offered by the shelter, asserts that the shelter is efficiently run, and concludes that this constitutes evidence that there are no less restrictive alternatives that could serve the County's goals. (*Post,* at pp. 221, 223.)

The dissent also mistakes the County's arguments on appeal for evidence in the record that would support such arguments. For example, the dissent states that "[r]egardless of whether some benefits could be provided as effectively without the residency requirement, the county has justified that requirement by *noting* that other benefits, such as shelter, could not otherwise be so provided." (*Post,* at p. 223, italics added; compare *post,* at p. 222.) However, there is no evidence in the record that shelter "could not otherwise be so provided." The dissent itself contends that the record is silent concerning the feasibility of County sponsored low-income housing in terms of the "county's current bonded indebtedness or its ability as a practical matter to market . . . bonds." (*Post,* at p. 222.) The County's bald assertion that shelter "could not otherwise be so provided" does not constitute evidence that there are no viable alternatives to forced residence at the Bannon Street facility.

Instead of relying on evidence produced by the County, the dissent implies throughout that plaintiffs bear the burden of suggesting less restrictive alternatives and demonstrating their feasibility. (See *post,* at pp. 221, 222, 223.) The dissent argues at length that every alternative mentioned by the majority is incapable of serving the County's goals or is unsupported by the record. (See *ibid.*) This approach stands the unconstitutional conditions doctrine on its head. Neither the party complaining of the unconstitutional condition, nor this court, bears the burden of establishing that effective and less restrictive alternatives exist. The burden of proof is borne by the governmental entity that seeks to impose the condition. (*Myers, supra,* 29 Cal.3d at pp. 265-266; *Parrish, supra,* 66 Cal.2d at p. 271; *Bagley, supra,* 65 Cal.2d at pp. 501-502.)

Of course, this court makes no ultimate determination that less restrictive alternatives do exist in this case. The decision that the trial court abused its discretion in refusing to issue the preliminary injunction is not a decision on the merits. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 75-76.) Although defendants failed to demonstrate to the trial court or this court that there are no less offensive alternatives that could serve the County's interests, they will have the opportunity to make such a showing at trial. In addition, this court does not purport to rule on the propriety (either statutory or constitutional) of other novel welfare programs not at issue in this case. (See *post,* at p. 226.)

Assuming all this were true, the improved standard of living provided needy citizens would be laudable. However, on this record, the County has not justified the paternalistic means chosen. The importance of achieving the goal does not "manifestly outweigh" the drastic impairment of the residents' fundamental right of privacy. The County could "improve" the quality of the daily lives of all its residents by requiring them to reside in camps, where a regimen of nutritious food, regular exercise, and adequate rest could be imposed. Yet, such an invasion by the state of its citizens' "right to be left alone" would clearly be unconstitutional. The denial of the fundamental right to privacy for impoverished citizens is no less intolerable simply because they are poor.

In addition, defendants have failed to demonstrate that the County cannot improve the quality of its general assistance program by adopting less restrictive alternatives to the policy requiring residence at the Bannon Street facility. Plaintiffs and amici have suggested several alternatives to the County's "in-kind" benefits program which they assert would improve the quality of the benefits provided, but would invade the recipients' privacy to a lesser degree. For example, they propose that the County offer residence at the Bannon Street facility on a voluntary basis, increase the level of the cash grant, or sponsor the construction of additional low-income housing. Defendants have failed to show that these or other possible alternatives would not improve the quality of benefits while imposing fewer restrictions on an individual's fundamental right to privacy.

Defendants' second justification for the County's policy is that it promotes self-reliance. This goal is important and even statutorily compelled. (See § 10000.) However, defendants have failed to show in what way the County's policy furthers this goal. In fact, the policy may actually inhibit self-reliance by depriving Bannon Street residents of their personal autonomy.

Defendants base their self-reliance argument on statistics indicating that recipients of "in-kind" aid stay at the Bannon Street facility for an average of less than 30 days. On the other hand, an average recipient of a cash grant receives general assistance benefits for nine months. Although this trend may save the County money, it does not indicate that the recipients of "in-kind" aid become economically "self-reliant." They could just as easily become destitute, involved in criminal enterprises, or dependent upon private charity. The brevity of the average sojourn at the Bannon Street facility may be less a reflection of self-reliance than a result of the inmates' natural aversion to the restraints on their freedom. (See also *ante,* at pp. 209-210.)

Again, defendants have made no attempt to find alternatives which are less restrictive of an individual's constitutional right to privacy. Defendants

fail to demonstrate the impracticality or the inadequacy of other options, such as job training, counseling, and cash benefits. These alternatives may be less restrictive of privacy rights and more likely to promote the state's interest in self-reliant citizens.

Defendants argue that the prevention of fraud is a valid state interest which justifies the County's policy. Indeed, fraud prevention is a legitimate state interest. (See *Parrish* v. *Civil Services Commission, supra,* 66 Cal.2d 260.) However, defendants have not adequately demonstrated that the County's policy furthers that goal in any meaningful way.

Of the more than 4,000 recipients of County general assistance benefits, only 67 reside at the Bannon Street facility. Further, defendants have made no attempt to restrict the receipt of "in-kind" benefits to those suspected of fraud. The County's policy arbitrarily imposes the "in-kind" benefit alternative on single and employable applicants, none of whom are alleged to have committed fraud. The County does not argue that single, employable applicants are more likely than other applicants to make fraudulent benefit claims.

Moreover, the County's policy imposes far broader restrictions on Bannon Street residents than is justified by an interest in fraud prevention. The County's policy is analogous to the "Operation Bedcheck" challenged in *Parrish* v. *Civil Service Commission, supra,* 66 Cal.2d 260. *Parrish* involved a challenge to Alameda County's policy of conducting mass morning raids on county welfare recipients' homes to detect "unauthorized males." As in the present case, the county's policy extended not only to claimants suspected of fraud, but also to nonsuspect claimants. (*Id.,* at pp. 272-274.) Further, the evidence in the record was inconclusive as to the efficacy of the raids in reducing fraud. This court held that the raids violated the recipients' constitutional right of privacy. (*Id.,* at p. 272.)

The same reasoning applies here. The County has failed to demonstrate that the "in-kind" benefits policy promotes the detection and prevention of welfare fraud. The deprivation of rights caused by this policy is great. The defendants have not demonstrated that it is the least restrictive way to ensure honest claims. Thus, this policy cannot be justified on the ground that it prevents fraud.

The final governmental interest cited by defendants is fiscal. As discussed previously, defendants state that County recipients of "in-kind" benefits receive general assistance for an average of 29 days as compared to the average period of 9.3 months for cash benefit recipients. They argue that

the County saves vast amounts of money when it denies benefits to an estimated 300-400 applicants a month who refuse to accept "in-kind" aid.[21]

This court is not unmindful of the budgetary constraints facing counties. Nonetheless, financial considerations cannot justify an infringement of a basic constitutional right absent a showing that no less onerous cost-cutting methods are available.

This court rejected an argument based on cost to a county in *Mooney v. Pickett, supra,* 4 Cal.3d 669. In *Mooney,* the plaintiff challenged the statutory validity of a county's denial of nonemergency general assistance benefits to employable single men. Although *Mooney* was decided on statutory grounds, its reasoning is instructive. "We are aware of the financial difficulties which attend present welfare programs on local, state, and national levels. This court, however, is not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law. We observe that the county retains extensive authority to establish standards for general assistance, both as to eligibility and as to amount of aid. In view of this discretion, the county can surely find many ways which do not violate state [law] in which it can limit general assistance payments to the financial resources available." (*Id.,* at p. 680.)

This reasoning applies with equal force to the County's defense of its "in-kind" benefits policy here. Again, the County has not demonstrated that there are no available alternatives that conserve fiscal resources while imposing fewer restrictions on the constitutional rights of recipients.

For all of these reasons, it would appear that plaintiffs are likely to succeed on the merits of their constitutional challenge. Therefore, the trial court should have granted the request for a preliminary injunction.

---

[21]The dissent argues that "[t]he savings to the county stem from the fact that the average Bannon Street shelter resident receives assistance for less than a month while other general assistance recipients receive assistance for over nine months, on the average." (*Post,* at p. 224.) However, only 67 persons reside in the Bannon Street shelter, while the County provides general assistance benefits to over 4,000 of its residents. Moreover, defendants do not deny that between 300 and 400 people a month are denied aid after they refuse to reside in the shelter. It is not apparent what portion of the County's savings is attributable to this denial of aid and what portion is attributable to the fact that Bannon Street residents receive assistance for less than the "average" period. Indeed, the county admits that "facts to support fiscal arguments have not been developed." Under these circumstances, it does not appear that the trial court could reasonably have concluded on fiscal grounds that "'the utility of imposing the [residence requirement] manifestly outweigh[s] any resulting impairment of constitutional rights.'" (*Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at p. 265.)

## III.

The two-pronged test for the issuance of a preliminary injunction has been met by plaintiffs. First, they will suffer far greater harm from a denial of the injunction than defendants will suffer from its issuance. Second, plaintiffs have shown a strong likelihood that they will succeed on the merits of both their statutory and constitutional claims. Under these circumstances, the trial court abused its discretion in refusing to grant the preliminary injunction. (See *Isert* v. *Riecks, supra,* 195 Cal. at p. 576; *Riviello* v. *Journeymen Barbers etc. Union, supra,* 88 Cal.App.2d at p. 510.)

The issuance of a writ of mandamus compelling the trial court to grant a preliminary injunction is not a decision on the merits. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 75-76; *Weingand* v. *Atlantic Sav. & Loan Assn.* (1970) 1 Cal.3d 806, 820 [83 Cal.Rptr. 650, 464 P.2d 106]; *Continental Baking, supra,* 68 Cal.2d at p. 528.) A full hearing is still required to adjudicate the merits of the parties' contentions.

Therefore, a peremptory writ of mandate shall issue directing the superior court to: 1) vacate its order denying the preliminary injunction; and 2) to enter an order granting the preliminary injunction. The statewide importance of these issues suggests that this case should be set for trial at the earliest possible date.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.**—I respectfully dissent. In my view, the trial court's denial of a preliminary injunction was amply supported by the evidence.

### I. *Procedural Setting and Standard of Review*

This case does not reach us on appeal after a trial on the merits. Rather, this is an extraordinary writ proceeding aimed at reviewing denial of a motion for preliminary injunction. A trial judge, in ruling on such a motion, considers the balance of harm and plaintiff's chance of success on the merits. The ultimate question is whether, on the whole, " 'the defendant should or . . . should not be restrained from exercising the right claimed by him.' " (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].) "Injunction has long been regarded as an extraordinary remedy which should be granted with caution. . . . Though the plaintiff makes a strong showing of the conditions which might ultimately support a final judgment . . ., that showing may be controverted by the defendant, and at this early stage the case may be regarded as a 'doubtful' one. . . . A

strong showing of the grounds for equitable relief and therefore of the ultimate right to a permanent injunction is not the equivalent of a showing of a pressing need for immediate temporary relief. Hence the discretion in deciding against provisional injunctive relief is seldom disturbed." (2 Witkin, Cal. Procedure (2d ed. 1970) Provisional Remedies, pp. 1516-1517, and cases cited.)

Our limited task is to decide whether the trial judge abused his discretion. (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379].) We must uphold his decision if there is sufficient evidence to justify it, viewing the evidence most favorably to the prevailing party and disregarding other facts that might support a different conclusion. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 580].) More specifically, our inquiry is whether the trial judge could have concluded that the relative balance of harm together with plaintiffs' chances of success on the merits warranted the denial of the preliminary injunction pending a full trial on the merits. I find ample evidence in the record to support the trial judge's decision.

After concluding that the balance of harm favors plaintiffs[1] (*ante,* p. 207) and that their likelihood of success on the merits is "strong" (*id.,* p. 218), the majority concludes that "the trial court abused its discretion in refusing to grant the preliminary injunction" (*ibid.*). I would hold that the trial judge did not err in finding that the balance of harm considered with plaintiffs' chances of success on the merits did not warrant the granting of the preliminary injunction.

## II. *Balancing of Harm*

The majority cites the "psychological impact" on the shelter residents from giving up control over their daily regimen and from the alternative of foregoing benefits as proof that plaintiffs "will suffer great and immediate harm" if the shelter is not enjoined. (*Ante,* p. 207.) The defendants challenged vigorously the evidence of psychological damage and presented competent evidence that the shelter has no deleterious psychological effect on the residents. Viewing the record most favorably to defendants, we should find that the trial judge reasonably concluded that any harm to the residents was minimal and, at least pending a trial, the balance of harm was not

---

[1]The majority incorrectly states that "Plaintiffs have met the first prong of the test for the issuance of a preliminary injunction." (*Ante,* p. 207.) As *Katz* makes clear, the two issues are not tests or requirements but *considerations* to be used in reaching the ultimate decision whether the injunction should issue. (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528.)

sufficiently in favor of plaintiffs to warrant issuing the preliminary injunction.

### III. *Chance of Success on the Merits*

The trial judge held that plaintiffs could not prevail on their claims regarding the county's lack of authority or the residents' privacy rights but that plaintiffs might prevail on the issue of the humane administration of the shelter.

A. *The County's Authority Under the Welfare and Institutions Code.* The county observes that Welfare and Institutions Code section 17002 (all further statutory references are to this code unless otherwise cited) specifically allows the county to establish, among other things, "almshouses." The county argues further that section 17001, by giving the county discretion to set eligibility standards and the kind and amount of relief, permits the county to condition the receipt of benefits upon residency in the shelter. The majority, without citing *any* authority, strongly implies that the power to establish almshouses does not include the power to condition benefits upon residing in such places. (*Ante,* p. 211.) The majority then holds that sections 17001 and 17002 cannot validate the shelter because the administration of the shelter violates section 10000,[2] and the discretion vested under section 17001 may not be exercised in a fashion that violates another statute. (*Ante,* p. 212.) Based on these holdings, the majority states that plaintiffs "have presented a persuasive argument that their statutory challenge will succeed at trial" and that "[d]efendants have offered only a weak defense of the County's policy." (*Ante,* p. 212, fn. omitted.)

The county's authority to establish almshouses and to condition general assistance benefits upon living in such places is not dependent upon whether a particular almshouse is administered in conformity with other statutes. The distinction is between the general and the particular. Even if the administration of *this* almshouse may violate the "humane" requirement of section 10000, the county still retains its general authority to establish almshouses under section 17002 and its discretion under section 17001 over eligibility and benefits. The trial judge was, in my view, correct when he found that plaintiffs could not prevail on their claims that the Bannon Street shelter exceeds the county's authority.

B. *The Shelter Residents' Privacy Rights.* The majority finds that the Bannon Street shelter program violates the residents' right to privacy under the

---

[2]The majority finds the Bannon Street shelter program violates section 10000 (*ante,* pp. 207-210), a conclusion with which I disagree (*infra,* pp. 223-225).

California Constitution. My colleagues hold that none of the legitimate interests furthered by the shelter is sufficient under the strict scrutiny test of *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 265-266 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]. In my view, this record fully supports the trial court's preliminary findings. Unfortunately, the majority's opinion and its strong dicta in support of plaintiffs seem tantamount to a final decision on this important constitutional question.

The county first justifies the Bannon Street shelter on the ground that it improves the quality of aid given to the residents. The majority, rejecting that justification, simply declares that this policy does not outweigh impairing the residents' right to privacy. (*Ante,* p. 215.) The evidence discloses that the shelter is kept clean and offers nutritious food and decent clothing to the residents. The shelter also provides free bus passes to enable the residents to seek jobs or simply to travel and to visit anyone they choose. An "incoming only" telephone (in addition to a pay telephone) serves as a message center for employment and other telephone calls for residents; often general assistance recipients do not have easy access to telephones. The residents also have access to an employment service worker for consultation at the shelter regarding job openings. The evidence shows that these benefits are often unobtainable or available only with great difficulty for general assistance recipients who do not live in the shelter. In short, the county's facilities are far superior to those in which many needy people must live. The majority holds, in effect, that no matter how effectively the shelter implements the policy of providing specific benefits, the privacy rights of the shelter residents outweigh that policy. I cannot agree.

The evidence, summarized above, fully supports the county's position that no less intrusive alternatives are available. The trial court, in its preliminary assessment of the evidence, could well have agreed. Nonetheless, the majority speculates that making residency at the shelter voluntary, increasing the amount of cash grants, "sponsor[ing]" the construction of low-income housing, "or other possible alternatives" would be less intrusive of privacy while furthering the county's interest in providing specific aid to general assistance recipients. (*Ante,* p. 215.) The trial judge could have found that each of those "alternatives" would defeat the legitimate purpose of providing better, more specific aid to general assistance recipients. To make residency in the shelter voluntary would defeat the purpose of ensuring that *all* recipients receive those benefits. If plaintiffs are to be believed, the shelter would be empty if residency were voluntary, thus completely defeating the county's interest in maintaining the shelter. Increasing the amount of the cash grants would not *ensure* that the recipients would provide themselves with appropriate aid. The county's interest in supplying

specific benefits would again be thwarted. Finally, additional low-income housing "sponsor[ed]" by the county presumably would involve the issuance of municipal bonds. Even if such assistance were feasible (and there is no evidence in the record as to the county's current bonded indebtedness or its ability as a practical matter to market such bonds) many of the specific benefits currently being offered by the Bannon Street shelter would not be available. The only sure benefit would be shelter. Food, clothing, utilities, telephones, transportation, and counseling would not necessarily be provided.

A second interest promoted by the Bannon Street shelter is one that is required by section 10000: encouraging "self-respect, self-reliance, and the desire to be a good citizen, useful to society." The county notes the benefits cited above[3] and argues that such qualities promote self-reliance among the residents. As proof of the shelter's success, the county points to the fact that shelter residents receive benefits for an average of less than one month. By contrast, general assistance recipients who do not reside in the shelter receive benefits for over nine months on the average. The majority is quick to conclude that, rather than becoming self-reliant, the shelter residents who leave "could just as easily become destitute, involved in criminal enterprises, or dependent upon private charity. The brevity of the average sojourn at the Bannon Street facility may be less a reflection of self-reliance than a result of the inmates' natural aversion to the restraints on their freedom." (*Ante*, p. 215.) On that speculative basis the majority concludes that the Bannon Street shelter does not promote self-reliance.

The majority's error is twofold. First, it makes an ultimate judgment on incomplete facts. Discovery has yet to be completed; live testimony has yet to be considered by the trial judge. Second, the majority relies on only those facts opposing the county's position. The evidence cited by the county, however, supports its position and likewise supports the trial court's judgment.

The majority also concludes that the county has failed to show that there are no less intrusive alternatives that promote self-reliance. As examples, the majority suggests "job training, counseling, and cash benefits." (*Ante*, p. 216.) Residents may consult an employment service worker, mentioned above, who provides information on available job openings and counsels residents on job searches. Of course, the shelter residents are free to take advantage of the welfare department's services offered to other welfare recipients. These services include job orientation, job referrals, and cash to

---

[3]The record also reflects that shelter residents, unlike other general assistance recipients, may keep any money they earn up to the general assistance eligibility limit.

purchase work tools, uniforms, and special shoes if necessary. In addition to job counselling, residents can receive counselling for alcoholism and can attend nondenominational religious services. Although residents do not receive outright cash grants, they have the benefit of retaining all earnings up to the maximum eligibility requirements. Regardless of whether some benefits could be provided as effectively without the residency requirement, the county has justified that requirement by noting that other benefits, such as shelter, could not otherwise be so provided. No less intrusive alternative is possible. In sum, the evidence at this stage sufficiently supports the county's contention that the Bannon Street shelter program serves the legitimate interest of promoting self-reliance among its residents and that the process by which the shelter does so is constitutionally permissible.

A third legitimate and significant interest supporting the Bannon Street shelter is fiscal. The majority's only oblique suggestion of less intrusive methods of saving money comes from the quotation from *Mooney* v. *Pickett* (1971) 4 Cal.3d 669 [94 Cal.Rptr. 279, 483 P.2d 1231], pointing out the county's discretion to establish standards for eligibility and amount of aid. Presumably, the majority is proposing that the county either raise the eligibility requirements, cut the amount of the cash grants, or both. The record is devoid of evidence that would support the conclusion that raising eligibility requirements would comport with the county's charge to provide relief to "*all* . . . poor, indigent persons . . ." under section 17000. (Italics added.) Simply cutting the amount of benefits likewise finds no support in the record as a permissible option. Indeed, the majority suggests *increasing* the cash grants as an alternative for furthering the other interests discussed above. The evidence supports the county's contention, with which the trial court could have agreed, that the shelter is efficiently run and that, accordingly, no less intrusive alternative would produce such fiscal savings while providing the in-kind benefits the county deems desirable.

The majority misapprehends the county's fiscal argument.[4] The majority states that the fiscal savings from the Bannon Street shelter flow from the

[4]In footnote 21 (*ante,* p. 217) the majority uses the county's statement that "facts to support fiscal arguments have not been developed" to argue that the trial judge unreasonably accepted the county's fiscal argument. That quotation is taken out of context. The county made that statement in the course of arguing that all county welfare recipients would suffer from the closure of the Bannon Street shelter because the county would be unable to raise sufficient revenues to provide cash grants to all eligible people. This inability would be caused by Proposition 13's limitation on the county's ability to generate tax revenues while section 17000's requirement to provide aid to all indigent people continued. The county indicated that authoritative monetary and demographic statistics had not been fully prepared to support that argument. The county did not intimate that facts have not been developed to support its argument that it saves money by operating the shelter. Although a complete record must await trial, the record and statements of counsel at oral argument fully support the assertion that the Bannon Street shelter program saves the county money in the aggregate. The trial judge had ample evidence from which to rule on this issue in the context of a motion for a preliminary injunction.

county's denial of "benefits to an estimated 300-400 applicants a month who refuse to accept 'in-kind' aid." (*Ante*, p. 217, fn. omitted.) As was noted during the oral argument of this case, the monthly cost of the shelter per resident is greater than the cash benefits provided to other general assistance recipients. The savings to the county stem from the fact that the average Bannon Street shelter resident receives assistance for less than a month while other general assistance recipients receive assistance for over nine months, on the average. Thus, the county not only spends more on each resident, and assures that that money is spent to provide practical assistance, but saves significant amounts of money in the aggregate.[5]

C. *The Humane Administration of the Bannon Street Shelter.* The trial judge concluded that plaintiffs ultimately *might* prevail on their claim that the shelter is not being administered "humanely." Nonetheless, the trial judge ruled that plaintiffs' chances of success on that claim, coupled with their failure on their other claims and the balance of harm between the parties, warranted the denial of the preliminary injunction.

The majority asserts that the program requires residents to give up their living quarters, to surrender "control over their daily lives," and to choose between living in the shelter or foregoing benefits. (*Ante*, p. 209.) On that basis, the majority concludes that the shelter is not being administered humanely.

As the majority points out, however, residency in the shelter is not required of those who own their own homes, live with a dependent child, or have a physical or mental incapacity. Those qualities would make the residency requirement more burdensome. If the factual record were complete, we would have the benefit of the trial judge's considered opinion of all the evidence bearing on this fact question. As it is, we must speculate. The shelter residents retain almost total control over their daily lives. The residents are required to be in the shelter only from 9 p.m. until morning and exceptions to this rule are permitted. Except for this requirement, the record does not disclose any affirmative duties imposed on them. The residents are free to come and go, eat at the shelter or not, visit with anyone they like, speak with anyone they like, and, in general, exercise complete control over their lives. Finally, the choice between participating in the program offered or foregoing benefits is always present, but does not reflect any "inhuman-

---

[5]The majority notes that the county's interest in the prevention of fraud does not justify the Bannon Street shelter program because the program is not reasonably related to the prevention of fraud—that is, the program itself does not prevent fraud—and that less intrusive alternatives are available. Because the county has identified at least one legitimate interest advanced by the shelter (indeed, the county has identified three such interests), the success of the fraud prevention argument is immaterial.

ity." The same choice exists for other general assistance recipients: take what is offered or go without. What the majority objects to are the alternatives, not the choice itself.

This record fully supports the conclusion that the shelter *is* humanely administered. As the majority notes, the county has asserted that the shelter is clean, the food nutritious, and the rules reasonable. (*Ante,* p. 209.) In fact, the defendants filed 23 declarations and other exhibits that extensively discuss the operation and condition of the Bannon Street shelter. This evidence came from shelter residents and employees as well as independent experts on the subjects of welfare, nutrition, economics, and medicine. The synthesis of that evidence is that the Bannon Street shelter is a well-run institution providing clean, healthy facilities for eating, sleeping, and bathing.

The majority does not contend that defendants' evidence is not credible. Rather, it cites plaintiffs' evidence and concludes that the shelter is inhumanely administered. *No* case law or statutory authority permits or supports that conclusion. Indeed, the opposite is compelled. We must view the evidence in the light most favorable to defendants. If we, on review, examine the record in light of the substantial evidence *supporting* the judgment, the ineluctable conclusion is that plaintiffs were not likely to prevail on this claim.

### IV. *Consequences of the Majority's Holdings*

The majority's analysis, going beyond simply examining the entire record for facts that support the trial judge's decision, is open to criticism on several grounds. First, of course, it is not the approach prescribed by law for our review. (*Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d at p. 925.) Second, by its premature conclusions the majority effectively precludes a fair trial on the merits. The majority strongly suggests that, despite any facts that could be adduced by defendants at trial, the Bannon Street shelter exceeds the defendants' statutory authority (*ante,* p. 212), the program is constitutionally infirm (*id.,* p. 218) and the shelter is inhumane (*id.,* p. 209). In light of today's decision a trial would seem pointless.

More importantly, by effectively foreclosing a fair trial, the majority's decision will deprive this court of a full factual record and the trial judge's thorough and thoughtful findings of fact and conclusions of law. The issues in this case are many and their resolution, particularly the constitutional issue, is largely dependent upon an evaluation of all the facts surrounding the Bannon Street shelter. By ruling now, the majority opinion is of necessity speculative and premature.

In addition, the other 57 counties of this state can glean little concrete guidance from this case because of the lack of a full record and the majority's premature substantive conclusions. Each of those counties must provide general assistance benefits under the same statutes considered here. All that can reasonably be said is that counties attempting any general assistance system other than issuing monthly checks do so at their peril. Such a result is regrettable both because the counties should be free to fashion benefit programs that best serve their needs and because this result was so easily avoidable.

Finally, even if the majority, following the established approach, were to find that the preliminary injunction should issue, they should have stopped with a finding that the trial judge abused his discretion rather than making what, as a practical matter, are final resolutions of important issues. Much of the majority's opinion is unnecessary and unwarranted to resolve the question of whether the preliminary injunction should issue.

The county's experiment with providing general assistance benefits, which saves the county an enormous amount of money, should be permitted to continue, at least until a complete factual record is created during trial. Overwhelming evidence supports the trial judge's decision to deny the preliminary injunction. I find no abuse of discretion.

I would deny the peremptory writ.