[No. A127935. First Dist., Div. Two. May 26, 2011.]

JANET CLEARY et al., Plaintiffs and Respondents, v.
COUNTY OF ALAMEDA et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V. and VI.

828

COUNSEL

Richard E. Winnie, County Counsel, and Jannie L. Wong, Deputy County Counsel, for Defendants and Appellants.

The Public Interest Law Project, Judith Z. Gold, Stephen Ronfeldt; Paul, Hastings, Janofsky & Walker, Grace A. Carter; Bay Area Legal Aid and Steven Weiss for Plaintiffs and Respondents.

Dechert, Matthew L. Larrabee, Muriel M. Korol and Steven G. Kalnoki for Coalition of California Welfare Rights Organizations, Homeless Action Center and Legal Services of Northern California as Amici Curiae on behalf of Plaintiffs and Respondents.

Shearman & Sterling and James Donato for the California Tax Reform Association and the Asian Law Alliance as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

HAERLE, J.—

## I. INTRODUCTION

The trial court issued a writ of mandate which prohibits the County of Alameda (the County)[1] from implementing a change to its General Assistance (GA) program. That planned change, which we will refer to herein as the "W-9 policy," would reduce the amount of a GA recipient's monthly grant by an amount equal to his or her housing allowance when the landlord of that recipient fails or refuses to provide the County with a taxpayer identification number (TIN) on an Alameda County Substitute Form W-9.

The trial court found that the W-9 policy is unlawful because it denies GA recipients a minimally acceptable level of care, it is arbitrary and inhumane, and it constitutes an improper sanction. (See Welf. & Inst. Code, §§ 17000, 17000.5, 10000, 17001.5, subd. (a)(5).)[2]

On appeal, the County contends that the W-9 policy does not violate any statute and that it is neither arbitrary nor capricious because the County is required to report landlord TIN information to the Internal Revenue Service (IRS) in order to comply with federal tax law. (See 26 U.S.C. § 6041.) We reject the County's contentions and, therefore, affirm the judgment.

---

[1] We use the term County to refer to all of the appellants.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

## II. THE STATUTORY FRAMEWORK

We begin with a brief overview of the statutory framework governing GA programs which provides context for our factual summary of the evidence pertaining to the W-9 policy.

" 'General assistance is a state-mandated program for the support of all poor or incapacitated county residents who lack other means of support.' [Citation.]" (*Bell v. Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1701 [28 Cal.Rptr.2d 919] (*Bell*).) It is a program of "last resort for indigent and disabled persons having no other means of support—it is the only means by which they can obtain the basic necessities of life. [Citations.]" (*Jennings v. Jones* (1985) 165 Cal.App.3d 1083, 1092 [212 Cal.Rptr. 134] (*Jennings*).)

"Counties are charged by the state with the duty to relieve and support the indigent and disabled. [Citations.]" (*Bell, supra,* 23 Cal.App.4th at p. 1703.) Two statutes set the general parameters of the County's authority to administer its GA program. Section 17000 states: "Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions." Section 17001 further provides that "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

Taken together, these statutes require that the County adopt standards of aid and care sufficient to satisfy its mandatory obligation to relieve and support its indigent poor. (*Mooney v. Pickett* (1971) 4 Cal.3d 669, 676 [94 Cal.Rptr. 279, 483 P.2d 1231] (*Mooney*); *City and County of San Francisco v. Superior Court* (1976) 57 Cal.App.3d 44, 47 [128 Cal.Rptr. 712].) "[T]he excuse that it cannot afford to do so is unavailing . . . ." (*City and County of San Francisco v. Superior Court, supra,* 57 Cal.App.3d at p. 47.) The County has discretion " 'to determine eligibility for, the type and amount of, and conditions to be attached to indigent relief.' [Citations.]" (*Mooney, supra,* 4 Cal.3d at pp. 678–679.) However, its discretion must be exercised within the "fixed boundaries" of its statutory authority. (*Id.* at p. 679.) In other words, its actions and policies must be consistent with and reasonably necessary to effectuate the purpose of the statutes governing GA programs. (*Ibid.*)

The statutory purpose of GA legislation is to "provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing

appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid shall be administered and services provided promptly and humanely . . . [and t]hat aid shall be so administered and services so provided, to the extent not in conflict with federal law, as to encourage self-respect, self-reliance, and the desire to be a good citizen, useful to society." (§ 10000.)

## III. STATEMENT OF FACTS

### A. *Background*

The County has delegated the task of administering its GA program to the Alameda County Social Services Agency (the Agency) which, in turn, has issued regulations to implement the program. (See *Watkins v. County of Alameda* (2009) 177 Cal.App.4th 320, 326 [98 Cal.Rptr.3d 847] (*Watkins*).)

In November 2007, the Agency adopted revised General Assistance Regulations (the 2007 Regulations). The 2007 Regulations fixed the "standard of need" for a single adult GA recipient at $336 per month. (2007 Regs., § 9-3-1.) This standard reflects the sum of the "in-kind values" of items of need that the County would provide to a single adult GA recipient, at no cost. Those items specified in the 2007 Regulations were: Rent—$147, Utilities—$44, Food—$117, Clothing—$11, Transportation Incidentals—$17. (2007 Regs., § 9-3-0.65.)

The 2007 Regulations required that, when a GA applicant/recipient had a fixed residence address in the county, the Agency had to obtain a completed "landlord's statement" prior to authorizing GA. (2007 Regs., § 9-3-1.4.) The landlord statement verified that the GA recipient was a legitimate renter and the amount of his or her rental obligation.

The 2007 Regulations also required that "[a]ll housing costs (rent, mortgage payments) must be paid by vendor payments." (2007 Regs., § 9-3-2.3.) Vendor payments were defined as "[p]ayments made directly to a person or agency supplying goods or services to the recipient." (2007 Regs., § 9-3-2.1.12.) An exception to the vendor payment of housing costs could be made, however, when the GA recipient's current living situation was not expected to last more than a full calendar year or when the recipient's landlord refused to sign the landlord statement. (2007 Regs., § 9-3-2.3.33.)[3]

---

[3] Evidence produced below indicates that the purpose of the County's "Vendor pay" policy was to ensure the timely payments of rent and to encourage the community to work with the Agency to provide adequate housing for GA recipients.

B. *The W-9 Policy*

In June 2008, the county board of supervisors established an ad hoc working group to review the GA program and make recommendations to "bring GA eligibility and assistance payments costs within budget . . . ." In December 2008, the Agency made recommendations to the County based on a report generated by the ad hoc working group. Among other things, the Agency recommended that the County "enforce IRS W-9 reporting requirements."

The same month that the Agency made this budget recommendation to the board of supervisors, it began to implement the W-9 policy which is the subject of this litigation. Notwithstanding this fact, the County has consistently denied that the W-9 policy is a cost-saving measure. According to Agency Director Yolanda Baldovinos, the W-9 policy was developed to address concerns relating to the Agency's tax reporting requirements to the IRS.

Andrea Ford, the Agency's director of policy, has provided the following description of the W-9 policy: "[A]ny recipient for General Assistance (GA) whose landlord does not supply the Agency with a Form W-9 would not receive a direct rent payment from the Agency. Under the W-9 policy, the total GA grant of any . . . recipient for GA whose landlord failed to supply the Agency with a Form W-9 would be reduced by $147.00 per month for an individual (the value of 'aid in kind' housing for an individual) and $241.00 for a couple (the value of the 'aid in kind' housing for a couple). Under the W-9 policy, an individual recipient who was not exempt from the policy and received a grant of up to $336 per month, but whose landlord failed to return a Form W-9 would have had their grant reduced to $189 per month."

The Form W-9 is a two-page "Request for Taxpayer Identification Number and Certification." The person completing the form is asked to provide taxpayer identification information, withholding information, personal background and contact information, and information about the nature of payments it receives from the County. The W-9 form also provides general information about obtaining a TIN, backup withholding, tax reporting and certification requirements.

In December 2008, the Agency began training staff to implement the new W-9 policy. It also sent notices to landlords of GA recipients requesting that they complete and return an enclosed IRS Form W-9 by January 5, 2009. The Agency's December 2008 notice stated, among other things, that vendor rent payments were considered by the IRS to be taxable income to the landlord, and that the landlord would no longer receive direct rent payments from the Agency unless he or she sent the Agency a completed Form W-9.

On January 15, 2009, Janet Cleary and Zackery Chappell (respondents) filed a petition for writ of mandate to compel the County to set aside its W-9 policy on the grounds that (1) it is unfair and inhumane, in violation of sections 17000, 10000 and 11000; (2) it constitutes an improper sanction, in violation of section 17001.5; and (3) notices the County sent about the new W-9 policy violated the due process and statutory rights of GA recipients.

## C. The Temporary Exception to the Grant Reduction

### 1. The Exception

In January 2009, the Agency made an internal decision to institute a "broad exception" to its W-9 policy, pursuant to which GA recipients whose landlords had not returned a completed W-9 would receive the rent portion of their GA grant on an Electronic Benefit Transfer (EBT) card.

On January 27, 2009, Agency staff was instructed to implement the grant reduction exception. That same day, the Agency sent notices to GA recipients advising them that if a Form W-9 was not received from their landlords by February 5, 2009, the recipients would begin receiving the rent portion of their grants on their EBT cards or checks in March and that they would be responsible for paying their rent directly to their landlords.

In a General Assistance Newsletter published March 2, 2009, Agency staff was advised regarding the "W-9 Process." The newsletter states that "[i]n order to meet the IRS requirement of providing income documentation to landlords who receive direct rent payments from SSA, we recently required that landlords complete and return an IRS W-9 [form]. As part of this process, the SSA will not vendor the rent payments to landlords that fail to submit a W-9 form, even when a Landlord Statement (90-9) has been received." Accordingly, the staff was instructed that "[t]o authorize a vendor payment, the landlord must return a completed W-9 form, listing a valid Taxpayer Identification Number (TIN) or Social Security Number (SSN)." If a completed landlord statement was received but the landlord had not provided a W-9, staff were to "authorize the entire grant amount to the EBT card."

### 2. The Revised Regulations

During the period that the Agency recognized the broad exception to the grant reduction component of its W-9 policy, it revised its regulations at least three times. Consequently, the County's September 15, 2009, revised General Assistance Regulations (the 2009 Regulations) are notably different from the 2007 Regulations that were in effect when the petition for writ of mandate was filed in this case.

Both the 2007 and the 2009 Regulations use the same overall standard of need calculation for a single adult GA recipient, which is $336. (2007 Regs., § 9-3-1; 2009 Regs., § 9-5-0.1.111.) However, the 2009 Regulations reflect a change in the Agency's determination of the "items of need" that are included in the standards of need calculation and the "value for in kind income" assigned to those items of need. Under the 2009 Regulations, a single adult's "Basic Needs" are assigned a value of $105, his or her "Housing/Utility Allowance" is assigned a value of $191, and his or her "Medical Care Allowance" is valued at $40. (2009 Regs., § 9-5-0.1.112.)

The 2009 Regulations set forth the Agency's policy regarding vendor payments in section 9-5-2, which states that "All housing **must** be paid by vendor payment" and that "Vendor payments require the Tax Identification Number TIN or Social Security Number SSN of the Vendor Payee." (2009 Regs., § 9-5-2.1.12-13, original boldface.) This regulation also states: "If a valid TIN or SSN for the vendor payee is not received, the applicant/recipient would be eligible to receive a voucher, or cash benefits, or other types of assistance, as determined to be appropriate." (2009 Regs., § 9-5-2.1.14.)

Under the 2009 Regulations, the only "Exemptions" from the vendor payment policy are if the GA recipient (1) has a verified permanent mental or physical disability that prevents him or her from working or (2) is a former foster care youth from the county and a current participant in the Independent Living Skills Program who is between the ages of 18 and 25. (2009 Regs., § 9-5-2.1.17.)

D. *Steps to Implement the Grant Reduction*

1. *Actions by the Agency*

In September 2009, the Agency sent a notice to GA recipients regarding another change to its W-9 policy, which the Agency referred to as the "Housing Assistance Vendor Program" (HAVP). The Agency's September 2009 notices informed GA recipients that, "[e]ffective November 1, 2009, all housing allowances (rent) must be paid directly to landlords. If your Landlord does not provide us with their tax identification or social security number, your GA grant will be reduced by the housing allowance."

In October 2009, the Agency sent "HAVP packet[s]" to GA recipients. The packet included, among other things, a "Housing Assistance Vendor Agreement," a Form W-9, and a notice that, if the landlord's TIN was not provided by December 17, 2009, the recipient's housing allowance would be "reduced" on January 1, 2010.

There is no evidence in the record that the County amended its regulations or otherwise adopted any formal policy to address the needs of GA recipients

who would lose their homes as a result of the W-9 policy. According to Agency director of policy, Andrea Ford, a GA recipient who is displaced as a result of the W-9 policy would be given a "CHASS" referral or referred to some other shelter bed. CHASS, which stands for Community Housing and Shelter Support, is the GA program for homeless GA recipients. (2009 Regs., § 9-2-0.)[4] CHASS benefits include a referral to a shelter, if available, and payment of a CHASS grant, if eligible, in the amount of $19. (2009 Regs., §§ 9-2-0.4, 9-5-0.1.111.)

Agency staff was instructed to adopt the following guidelines for addressing displacement problems caused by the W-9 policy: If a GA recipient contacted the Agency and reported that a TIN could not be provided for the landlord, the recipient would be asked to accept an offer of a referral to a shelter. If the recipient indicated that he or she would not accept an offer of a shelter bed, that recipient's grant would be reduced by the amount of the housing allowance. If the offer of a referral was accepted, then an actual referral would be made if a bed was available. If a bed was not available, the GA recipient would be paid a housing allowance on an EBT card, on a month-to-month basis.

During her deposition in this case, Agency Director Yolanda Baldovinos confirmed that, under the W-9 policy, "the options for someone whose landlord either does not or cannot provide a W-9 are to attempt to continue to subsist on the total amount of aid of either $105 a month, . . . or to become homeless and live in a shelter or on a street."

### 2. *The Winkfield Declaration*

David Winkfield submitted a declaration regarding his experience with the W-9 policy. Winkfield is a 52-year-old GA recipient who lives in the county. He suffers from chronic depression and arthritis and has a doctor's certification of his disability on file with the Agency.

Winkfield received a "Notice of Action" from the Agency dated October 23, 2009, which stated that his GA grant would be reduced from $336 to $105. The Agency notice stated that "[w]e changed your grant because you do not have a housing cost." Winkfield was very confused by this notice because his monthly rent payment in the amount of $200 is a housing cost. When he received this notice, Winkfield called his caseworker at the Agency but was unable to reach him. Winkfield could not leave a message because the caseworker's voice mail was full and the voice mail of the caseworker's supervisor was also full.

---

[4] According to the 2009 Regulations, the CHASS program is used to address the "Immediate Need [which] exists when an applicant lacks food and shelter, is without income or resources with which to meet those needs, and appears to be eligible for GA." (2009 Regs., § 9-2-0.1.)

Winkfield also received an HAVP packet from the County in November 2009. He was confused by the documents because one page stated that he had to submit a W-9 from his landlord by November 19 and another said he had until December 17 to turn in the form. In any event, Winkfield could not meet either deadline. His landlord refused to complete the W-9 because she values her privacy and does not understand why she needs to fill out the form. As Winkfield explained in his declaration, "After all, before all of this happened, when the Agency was paying my rent to my landlord, it was only giving her what was my money instead of paying it to me so I could make my rent payments, and if I was paying my rent directly, my landlord wouldn't need to give me any tax forms."

In his declaration, Winkfield stated that he had heard that a person with a certified disability would not lose his housing allowance as a result of the W-9 policy. Nevertheless, he received notices that he would in fact lose his allowance and he does not understand "why this is happening" to him. He is confused by the Agency's notices and concerned that the "Agency just doesn't seem to know what it is doing." Nor does Winkfield know what he can do, especially since he is unable to reach his caseworker.

E. *Impact of the W-9 Policy*

Respondents produced evidence regarding the impact of the W-9 policy through the declaration of Boona Cheema, the executive director of Building Opportunities for Self-Sufficiency (BOSS), a nonprofit organization "that seeks to help homeless, poor and disabled people in Alameda County achieve health and self-sufficiency." BOSS serves over 2,000 new homeless clients a year and it has provided services to more than 60,000 homeless individuals and families in the county since its establishment in 1971. Cheema works directly with clients and other program providers including the Agency. She has extensive knowledge of and experience with the County's GA program and its GA population.

According to Cheema, GA recipients, with virtually no money or re-sources, have no bargaining power in the rental market.[5] Many sublet from other very poor people who are unwilling or unable to submit a W-9 for any number of reasons, "including that these landlords may have serious disabili-ties, not understand the W-9 requirements, not be able to read or fill out the forms, not speak English, fear adverse tax or other consequences, be undocu-mented, or simply will not get the task done on time." Furthermore, even

---

[5] Cheema has personally helped to place clients in very low-cost housing such as single-room-occupancy hotels and shared rentals and subtenant situations. She also has daily contact with landlords and firsthand knowledge that many landlords do not want to accept GA recipients.

commercial landlords have many reasons not to comply with the requirement, such as hostility, laziness and overwork. Landlords do not have to give this information for any other tenants and may well object to the intrusion into their privacy.

Cheema also explained that many GA recipients who received notices from the Agency about the W-9 policy do not know to ask for a shelter bed because the Agency never notified them that option was available. Some recipients who would know to contact the Agency will nevertheless reject an offer of a shelter bed out of fear about the conditions in shelters or out of pride. Furthermore, an offer of a shelter bed would be illusory because there is a tremendous shortage of shelter beds in the County. In 2009, the County had an estimated homeless population in excess of 7,000 people.[6] However, there are only a total of 513 shelter beds in the County that are available to homeless individuals (nonfamily shelter beds). Of this number, approximately 83 beds are CHASS beds, which are reserved for County placements. "The remainder of the beds, located in privately run shelters, need not be given to homeless persons referred by the County if the shelter prefers to give that bed to someone else."

Finally, Cheema explained, there is a significant likelihood that an individual who is rendered homeless because of the W-9 policy will not receive any GA assistance at all. A homeless individual has difficulty meeting the stringent GA program requirements for many reasons: "He must spend the bulk of his time seeking protection from the elements and enough money to survive. Homeless people have limited access to mail, so they miss County notices about the requirements of the program, miss appointments, reporting requirements, and deadlines, and lose their aid. Lacking any home base where they can store belongings, receive mail, and simply keep themselves organized contributes to the likelihood that they will unintentionally violate GA requirements and lose their aid."

### F. The Trial Court's Decision

At the conclusion of a hearing on December 14, 2009, the Honorable Frank Roesch granted the petition for writ of mandate. On December 23, 2009, the court filed a 10-page order (the December 23, 2009, order) which contains findings of fact and law supporting the trial court's determination that respondents are entitled to relief pursuant to each of the their three causes of action. Thus, the court found that (1) the W-9 policy is unlawful,

---

[6] The purpose of a shelter bed is to provide emergency housing for individuals without a home. Thus, Cheema points out, the W-9 policy will not only render many GA recipients homeless, it will also displace other homeless individuals and deprive them of emergency shelter and care.

arbitrary, inhumane and outside the limits of the Agency's discretion; (2) the policy imposes an improper sanction; and (3) the Agency must advise GA recipients that the W-9 policy will not be enforced.

On January 16, 2010, the court filed a judgment granting a writ of mandate which requires the following: (1) the County may not set or reduce GA grant levels based on whether the landlord of a GA recipient or applicant has provided the County with a W-9 or SSN; (2) the County may not condition the disbursement of rent to the landlord of a GA recipient on the receipt of a W-9 or SSN; (3) the County shall notify all GA recipients that the W-9 policy is no longer in effect; and (4) the Agency's form 90-9 (the landlord statement) shall be modified to "at a minimum" state that the disclosure of a landlord's TIN or SSN is optional.

## IV. THE W-9 POLICY IS UNLAWFUL

A. *The Policy at Issue*

Before we turn to the substantive claims of error, we find it necessary to clarify the subject of this litigation. In this court, the County characterizes the Agency's W-9 policy as a "Regulation." It maintains that the W-9 policy is regulation section 9-5-2.1. As reflected in our factual summary, regulation section 9-5-2.1 states that housing must be paid by vendor payment, that vendor payments require a TIN or SSN of the vendor payee and that, if a valid TIN or SSN is not received, the GA recipient would be eligible to receive a voucher, cash benefits, or other type of assistance, as determined to be appropriate. Undoubtedly, the Agency designed and adopted regulation section 9-5-2.1 during the lower court proceedings in order to facilitate implementing the W-9 policy. However, it does not contain that policy nor mandate its consequences.

Under regulation section 9-5-2.1, a GA recipient whose landlord has not provided a valid TIN or SSN *may* be paid a voucher, cash benefit or other type of assistance. Under the W-9 policy, by contrast, a GA-eligible resident whose landlord refuses to complete a W-9 will have his grant reduced by the amount of his housing allowance. Furthermore, he must become homeless before he can obtain any housing assistance at all. Even then, such an individual cannot be paid a cash allowance unless he accepts a referral to a homeless shelter and then no shelter bed is available. This is the policy which gave rise to the petition for writ of mandate and which is the subject of the judgment we review here.

B. *Standard of Review and Issues Presented*

 To be valid, an Agency policy must be consistent and not in conflict with the statutes governing GA programs, and reasonably necessary to

effectuate the purpose of those statutes. (See *Mooney, supra*, 4 Cal.3d at p. 679; *Watkins, supra*, 177 Cal.App.4th at pp. 335–336; see also Gov. Code, § 11342.2.) On review, we make an independent determination whether the W-9 policy is consistent with statutory provisions governing GA programs. When considering whether a policy is reasonably necessary, we defer to the Agency's expertise to the extent implicated by asking whether its policy is " 'arbitrary, capricious, or without reasonable or rational basis.' " (*Watkins, supra*, 177 Cal.App.4th at p. 335.)

Respondents contend, and the trial court found, that the W-9 policy is unlawful because it is inconsistent with the County's statutory obligations to (1) provide a minimum standard of care for its indigent poor (§§ 17000–17001), (2) administer aid promptly and humanely (§ 10000), and (3) limit sanctions for failure to comply with program requirements to cases in which the GA recipient acted without good cause (§ 17001.5). The County disputes each of these claims and further contends that the policy is reasonably necessary to comply with federal tax law. We will separately address each of these issues.

## C. *The Duty to Provide a Standard of Care*

■ Sections 17000 and 17001 impose a mandatory obligation on counties to establish and meet acceptable standards of care for their indigent poor. (*Mooney, supra*, 4 Cal.3d at p. 676; *City and County of San Francisco v. Superior Court, supra*, 57 Cal.App.3d at p. 47.) In the past, some courts required that counties verify their standard of care calculations with specific factual studies of the needs of their residents. (See generally *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 992 [90 Cal.Rptr.2d 236, 987 P.2d 705] (*Hunt*).)

However, section 17000.5, which was enacted in 1991, now provides an alternate method for a county to adopt a legally adequate standard of care. (*Watkins, supra*, 177 Cal.App.4th at p. 332.) Section 17000.5 states, in relevant part: "(a) The board of supervisors in any county may adopt a general assistance standard of aid, including the value of in-kind aid . . . that is 62 percent of a guideline that is equal to the 1991 federal official poverty line . . . . [¶] (b) The adoption of a standard of aid pursuant to this section shall constitute a sufficient standard of aid."

With the enactment of section 17000.5, "a county need no longer set a standard of aid that meets the actual basic needs of its indigent general assistance recipients, but may provide a lower level of benefits, provided that standard of aid meets the 62 percent requirement." (*Bell, supra*, 23 Cal.App.4th at p. 1704.) In essence, section 17000.5 provides "a safe harbor for counties choosing to adopt this standard of aid. [Citations.]" (*Hunt, supra*, 21 Cal.4th at p. 992.)

Section 17000.5 also clarifies that the GA standard of care can be satisfied with in-kind aid as well as with cash grants. (*Watkins, supra,* 177 Cal.App.4th at p. 332.) Therefore, for example, "[a] county may satisfy its statutory obligation to support and relieve the indigent by providing in-kind aid such as food and shelter, and may reduce general assistance grant levels by the value of in-kind aid that is actually made available. [Citations.]" (*Hunt, supra,* 21 Cal.4th at pp. 992–993.)

In the present case, the County's standard of care for a single adult GA recipient is $336 per month.[7] Respondents accept this standard, but contend that the W-9 policy is unlawful because it reduces the standard of care afforded to a single adult GA recipient to $105 per month by eliminating the housing allowance portion of the GA recipient's grant and that this lowered standard does not satisfy the County's statutory obligation to care for its indigent residents.

The County does not contend that a monthly payment of $105 constitutes a legally adequate standard of care. Instead, the County takes the position that individuals who are rendered homeless by the W-9 policy will be provided an alternative form of in-kind assistance, the value of which satisfies the County's legal obligation under sections 17000 and 17000.5. According to the County, a GA recipient "who becomes homeless as a result of failure to provide the County with a landlord's tax identification number, is offered a shelter referral" pursuant to the provisions of regulation section 9-2-0, and these "in kind" shelter benefits satisfy the County's obligation to provide a minimum standard of care.

As discussed in our factual summary, regulation section 9-2-0 is the CHASS program for homeless GA applicants and recipients. This regulation states that "The Agency shall provide in-kind shelter (housing & utilities) and food to homeless applicants/recipients for GA through the CHASS program or through a referral to a shelter." A GA recipient who is placed in a CHASS bed or another shelter also receives $19 for personal incidentals. Furthermore, if a GA recipient accepts a referral to a CHASS program or shelter but no beds are available, the recipient is entitled to the full eligible grant amount.

The County maintains that CHASS and shelter referrals are appropriate alternative "in-kind" benefits for GA recipients who are "not eligible for direct landlord rent payments" because the value of these benefits "exceed[s] the minimum level of aid mandated under Section 17000.5." According to the

---

[7] The County produced evidence, through the declaration of Andrea Ford, that its $336 standard of need formula satisfies the safe harbor standard set forth in section 17000.5. According to Ford, "The 1991 federal poverty level is $6620 per year; 62% of $6620 = $4104 per year; $4104/12 months = $342 per month. $342 per month reduced by 1.5% = $336."

County's evidence, the average monthly cost of a CHASS placement is $720, and of a shelter bed is $976, both of which exceed the $336 standard of need.

The County's justification fails, however, because it does not address the actual consequence of the W-9 policy, which is to require eligible residents whose landlords fail to provide W-9's to become homeless before receiving any housing assistance at all. The notion that such a policy can be justified simply because the GA program contains regulations for addressing the immediate needs of individuals who are already homeless is illogical and unreasonable. To put the matter a different way, an offer of a shelter bed to a homeless person may constitute a satisfactory in-kind alternative to a cash grant for housing and food, but it does not justify *displacing* a GA recipient from his home by refusing to pay the housing allowance portion of his grant.

■ The County insists that the Agency has broad discretion to reduce GA grant levels by the value of in-kind aid. We agree. (See, e.g., § 17001.5, subd. (c) ["A county may provide aid pursuant to Section 17000.5 either by cash assistance, in-kind aid, a two-party payment, voucher payment, or check drawn to the order of a third-party provider of services to the recipient. Nothing shall restrict a county from providing more than one method of aid to an individual recipient."].) But, the County's entire argument begs the question of what constitutes in-kind aid.

Under the Agency's own regulations, direct rent payments to landlords are the in-kind benefit that will be paid on behalf of eligible GA recipients who have a fixed residence in the county. (2009 Regs., § 9-5-2.1.) Shelter referrals, by contrast, are the in-kind benefit that will be paid to a homeless GA recipient to address the immediate needs resulting from the conditions of homelessness. (2009 Regs., § 9-2-0.) In defending the W-9 policy, the County obliterates the distinction between these two very different types of aid and ignores the reality of the situation it attempts to justify.

Furthermore, even if we could be convinced that emergency shelter benefits and vendor rent payments are interchangeable forms of in-kind aid, undisputed evidence in this record establishes that there are not nearly enough shelter beds in the county to accommodate its homeless population. "Nothing in the provisions which permit counties to provide in-kind benefits in lieu of cash allows counties to reduce assistance below statutorily mandated minimums by including the value of illusory in-kind benefits in their assistance package." (*Bell, supra*, 23 Cal.App.4th at p. 1706.)

In *Bell*, this county attempted to justify an Agency plan to eliminate the shelter allowance component of a homeless recipient's GA grant on the ground that a homeless person does not actually incur any housing expense.

(*Bell, supra,* 23 Cal.App.4th at pp. 1701–1702, 1705–1706.) This court held that "[w]hile a county may condition shelter benefits on need, and accordingly may reduce the cash component of shelter assistance to the lesser cost to the recipient of shelter actually received or shown to be reasonably available, it cannot reduce or eliminate shelter benefits where adequate shelter is neither provided nor realistically available to recipients." (*Id.* at p. 1706.)

The County contends that *Bell* is "inapplicable to our case" because respondents have made only a "facial challenge" to the W-9 policy and, under that policy, if a shelter bed is not available, the recipient will be given a full GA grant. Therefore, the County maintains, the issue whether "the County has enough beds for recipients who may become homeless as a result of the [W-9 policy] is irrelevant."

Contrary to the County's contention, *Bell* was also a facial challenge; it was a consolidated mandate proceeding challenging various provisions of an ordinance that this county adopted in 1991. (*Bell, supra,* 23 Cal.App.4th at p. 1702.) It was in that context that this court affirmed and applied the law that a "[c]ounty may not provide in-kind aid in such a way as to render the benefit illusory." (*Id.* at p. 1710.) As we explained, "[i]n-kind assistance would prove illusory if it did not actually confer the purported benefit or if the burden of using the benefit was unreasonably onerous." (*Ibid.*)

Furthermore, the County's "facial" analysis is unsound. As we have already explained, regulation section 9-2-0, which requires the Agency to provide a shelter referral and to pay a housing allowance to a willing recipient when a shelter is not available, expressly applies only to *homeless* GA applicants or recipients. By definition, an individual subject to the W-9 policy is not homeless and there is no evidence in this record to support the County's assurance that such an individual will be offered a shelter referral at all.

On its face, the W-9 policy *denies* a housing allowance to a GA-eligible resident of the county whose landlord will not complete a W-9; it does not offer any alternative form of "in-kind" housing assistance. Furthermore, even if we assume that such an offer will eventually be made by the Agency, the relevant point is that the W-9 policy requires the GA recipient to give up his home and become a homeless person in order to obtain *any* housing assistance from the County. Then, assuming he qualifies for the CHASS program, the only housing aid offered to that displaced individual is a referral to a homeless shelter which, as we have already explained, is not in-kind aid and, on this record, is not even likely to be available. After the GA recipient takes these steps, i.e., gives up his home and agrees to accept a referral to a shelter, then if there is no available shelter bed, he can obtain an in-kind cash

payment for his housing needs, *but only* until a shelter bed becomes available. Of course, by that time he likely no longer has a residence to rent. In any event, the provision of housing aid is inextricably tied to a commitment to a life of homelessness.

■ These circumstances establish that the W-9 policy violates section 17000 because the conditions it imposes for obtaining housing assistance are unreasonable, if not intolerable. "A county does not fulfill its statutory mandate to 'relieve and support' its indigents by forcing them into such adverse conditions that they either refuse the type of aid provided or leave because they cannot tolerate its deprivations." (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 210 [211 Cal.Rptr. 398, 695 P.2d 695] (*Robbins*).)

County residents who are subject to the grant reduction consequence of the W-9 policy will be deprived of a minimally acceptable level of care because they will be denied any housing allowance unless and until they give up their housing and agree to become homeless. Therefore, the W-9 policy conflicts with the County's mandatory obligation under sections 17000 and 17001 to care for its indigent poor.

D. *The Duty to Administer Aid Humanely and to Foster Self-respect and Self-reliance*

■ Section 11000 states: "The provisions of law relating to a public assistance program shall be fairly and equitably construed to effect the stated objects and purposes of the program." As noted at the outset of our opinion, the purpose of GA legislation is to ensure that aid and services are provided "promptly and humanely," and so as to encourage "self-respect, self-reliance, and the desire to be a good citizen, useful to society." (§ 10000.)

In *Robbins, supra,* 38 Cal.3d 199, the plaintiffs challenged a county's " 'in-kind' benefits policy," which required that residents who were single, employable and eligible for GA benefits live in a county facility in lieu of cash benefits. (*Id.* at p. 208.) Our Supreme Court held that the challenged policy violated both statutory and constitutional law. The policy violated the goals of the state's welfare laws because it compelled impoverished residents to either "give up their living quarters and control over their daily lives in exchange for residence in a rigidly regulated facility," or refuse to live in the facility and be denied any housing benefit. (*Id.* at p. 209.) As the court explained, "[n]either 'option' offered by the County's policy comports with the statutory purposes and legislative intent set forth in section 10000. Indeed, the very fact that the County forces eligible residents to face such a grim choice, when they are already in desperate straits, suggests that the program is not being humanely administered." (*Ibid.*)

■ Like the policy that was disapproved in *Robbins*, the W-9 policy is inconsistent with the purpose and intent of general welfare legislation. It requires eligible residents of the community whose landlords will not complete W-9's to either give up their living quarters in exchange for the possibility of a shelter bed or to keep their homes and be denied any housing benefit at all. A policy which forces this choice on individuals who have no other means of support conflicts with the County's obligation to humanely administer its program.

The County attempts to distinguish *Robbins* by arguing that the W-9 policy "does not condition receipt of benefits upon residency in a single rigidly-run facility." It argues that there is no support in this record for a finding that the shelters available to GA recipients who are displaced by the W-9 policy have the "same restrictive conditions" as the facility in *Robbins*.

First, the County's distinction misses the relevant point. Both the policy at issue in *Robbins* and the W-9 policy require GA recipients to give up their homes in order to obtain a housing benefit. This condition, i.e., requiring an indigent resident to become homeless in order to obtain housing aid, is inhumane, regardless of the quality of the homeless shelters that the County may provide. As the trial court found, "to cause a person to become homeless, and then offer a shelter bed in lieu of any other housing aid is inhumane, does not foster self-sufficiency, and is therefore illegal . . . ."

Second, the County overlooks the evidence we do have about homeless shelters in the county. That undisputed evidence shows that there are not nearly enough beds to shelter those individuals who will be·displaced by the W-9 policy. Because the W-9 policy actually makes GA recipients become homeless, evidence regarding the severe shortage of shelter beds in the county makes the W-9 policy all that more inhumane. Furthermore, as discussed more fully in our factual summary, the record also establishes that it is extremely difficult for homeless individuals to comply with the requirements for obtaining GA and that homeless residents are far more likely to lose their GA aid. Thus, a policy which fosters homelessness is inimical to the very purpose of GA legislation.

We find that the W-9 policy conflicts with the County's statutory duty to administer aid "humanely," and to encourage "self-respect, self-reliance, and the desire to be a good citizen, useful to society." (§ 10000.)

E. *The Duty to Limit Sanctions to Violations Without Good Cause*

■ Section 17001.5, subdivision (a)(5), authorizes a county to "discontinue aid to, or sanction, [GA] recipients for failure or refusal *without good*

*cause* to follow program requirements." (Italics added.) Lack of good cause is defined by this statute as "(A) willful failure or refusal of the recipient to follow program requirements, or (B) not less than three separate acts of negligent failure of the recipient to follow program requirements."

The lack of good cause requirement which is codified in section 17001.5, subdivision (a)(5), is a necessary component of a sanction for noncompliance with a GA program requirement because of the statutory obligation imposed on counties to administer their public assistance programs in a fair and equitable manner. (*Jennings, supra*, 165 Cal.App.3d at pp. 1092–1093.) In *Jennings*, Division Five of this court invalidated a county policy of terminating GA benefits for a fixed duration of time for failure to comply with various GA program requirements because that policy did not "distinguish between competent, healthy individuals who willfully fail to comply, and those whose failure is due to mere negligence, inadvertence, or mental or physical disability." (*Id.* at p. 1093.)

In the present case, the Agency's W-9 policy imposes a serious sanction on GA recipients for failure to comply with a program requirement without any consideration as to whether that noncompliance is willful. Indeed, the W-9 policy is even more egregious than the policy disapproved in *Jennings* because, in this case, the GA recipient does not have the independent power to comply. As Agency Director Yolanda Baldovinos conceded in her deposition, (1) it is the landlord and not the GA recipient who has to provide the W-9, and (2) the "grant cut" consequence of the W-9 policy applies "whether or not the recipient is the slightest bit at fault in their landlord's failure or inability to provide the W-9 . . . ."

The County contends the W-9 policy does not offend section 17001.5, subdivision (a)(5), because the requirement that a landlord provide a TIN or SSN is not a "program requirement," but rather an "eligibility requirement." This argument is unsound. An individual's eligibility for GA has nothing whatsoever to do with his or her landlord's TIN or SSN information. Indeed, as respondents point out, Agency regulations contain a specific and detailed set of eligibility requirements which make no reference to the W-9 requirement.[8]

In its reply brief, the County concedes that the landlord TIN requirement is "not an eligibility requirement for entitlement to general assistance under section 17000," but maintains that it is an "eligibility requirement for

---

[8] We grant respondents' request for judicial notice, which includes a copy of the County's July 19, 2010, revised General Assistance Regulations. Eligibility factors are set forth in regulation sections 9-3-0 through 9-3-8.

participation in the Housing Assistance Vendor Program." Under this reasoning, any program requirement could also be construed as an eligibility requirement and section 17001.5, subdivision (a)(5), would have no purpose at all.

The County also argues that the grant reduction component of the W-9 policy is not a sanction because GA recipients who are displaced by the W-9 policy will receive an in-kind shelter benefit. We have already rejected this theory; the possibility of a shelter referral and a vendor housing payment are not interchangeable forms of in-kind aid. Furthermore, and in any event, the real sanction imposed by this policy is that a GA recipient whose landlord fails to comply with the Agency's program requirement is forced to move out of his home and to become a homeless person in order to obtain any housing assistance at all.

■ Reducing the amount of a GA recipient's grant by the value of his housing allowance solely because his landlord fails to complete a W-9 constitutes a sanction for failing to comply with a program requirement. On its face, the W-9 policy imposes this sanction when noncompliance with the program requirement is neither willful nor negligent. Therefore, the County's W-9 policy directly conflicts with section 17001.5, subdivision (a)(5).

### F. Federal Tax Law

The County contends that the W-9 policy is both lawful and reasonably necessary because federal tax law requires that the Agency report landlord TIN or SSN information in connection with its housing vendor payments. We reject this argument for two independent reasons. First, the claimed tax reporting requirement does not mandate or justify the unlawful components of the W-9 policy. Second, the record supports the trial court's finding that an exception to the reporting requirement applies to vendor housing payments.

#### 1. Effect of Potential Reporting Requirement

The County assumes that it can justify the W-9 policy by establishing that the Agency is required to report landlord TIN information to the IRS when it makes a vendor rent payment to the landlord of a GA recipient. Frankly, we are perplexed by this assumption. Whether or not a direct vendor rent payment triggers a reporting obligation, the County may not voluntarily implement a policy which conflicts with the mandates of the GA law.

The County contends that there is no other reasonably available alternative for the Agency to comply with federal tax law. But this contention rests on the false premise that federal tax law compels the W-9 policy. In fact, federal

tax law does not require the County to either (1) use direct vendor rent payments to provide housing aid to eligible residents or (2) reduce the amount of a GA recipient's grant solely because his or her landlord refuses to complete a W-9. There is no question, on this record, that the County can provide legally mandated housing aid to its indigent poor without violating federal tax law even if the Agency is required to report landlord TIN information in connection with landlord vendor payments.

For example, as the County acknowledges, the IRS has expressly authorized alternative procedures for situations in which the payee's TIN information is not available. (See 26 U.S.C. § 3406.) The County contends that it has already established that the Agency's computer program is incompatible with these alternative procedures. Even if we accept that evidence, however, we fail to see how a computer problem justifies violating express statutory mandates.

Alternatively, if the Agency elects not to reprogram its computer, it also has the option of implementing a policy which does not unlawfully punish GA recipients whose landlords fail to provide W-9's. For example, Agency regulations expressly authorize the payment of a housing allowance directly to the GA recipient. (2009 Regs., § 9-5-2.1.) Indeed, during the lower court litigation in this very case the Agency made such direct payments to GA recipients. Thus, the County's claim that there is no reasonable alternative to the W-9 policy rings hollow.

### 2. *Exception to the Reporting Requirement*

The record before us also supports the trial court's finding that the Agency is not required to report landlord TIN information to the IRS in connection with vendor rent payments.

### a. *Background*

The County contends that it must report landlord TIN information to the IRS pursuant to section 6041(a) of the Internal Revenue Code (26 U.S.C. § 6041(a) (section 6041(a))), which states: "All persons engaged in a trade or business and making payment in the course of such trade or business to another person, of rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable gains, profits, and income (other than payments to which section 6042(a)(1), 6044(a)(1), 6047(e), 6049(a), or 6050N(a) applies, and other than payments with respect to which a statement is required under the authority of section 6042(a)(2), 6044(a)(2), or 6045), of $600 or more in any taxable year, . . . shall render a true and accurate return to the Secretary, under such regulations and in such

form and manner and to such extent as may be prescribed by the Secretary, setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment."

The County further contends that landlord vendor payments do not fall within an exception to the section 6041(a) reporting requirement, which is set forth in 26 Code of Federal Regulations part 1.6041-1(e) (2011). Under this regulation, a "person that makes a payment in the course of its trade or business on behalf of another person" has a reporting obligation *only* if he or she either "[p]erforms management or oversight functions in connection with the payment" or "[h]as a significant economic interest in the payment."[9] Like the parties, we will refer to the exception created by this regulation as the "Middleman exception."

The County does not claim any significant economic interest in the landlord vendor payments. It does, however, maintain that the Agency performs management or oversight functions in connection with these payments which precludes it from invoking the Middleman exception to the section 6041(a) reporting requirement. A few days before the hearing on the petition for writ of mandate, the County attempted to support this position by filing a declaration from Malinda Jones-Williams, the division chief of the county's auditor-controller's office. Attached as exhibits to this declaration were a September 8, 2009, "Private Letter Ruling Request" that Jones-Williams sent to the IRS and a December 10, 2009, response from the IRS (the December 2009 private ruling).

In her Private Letter Ruling Request, Jones-Williams asked the IRS to confirm that (1) the section 6041(a) reporting requirements apply to the County's landlord vendor payments and (2) the Middleman exception does not apply to those payments even though they are made on behalf of GA recipients, who would not have a reporting requirement if they made the payments directly to their landlords, because the Agency performs management or oversight functions in connection with the payments.

---

[9] Title 26 Code of Federal Regulations part 1.6041-1(e) (2011) states: "(e) Payment made on behalf of another person—(1) In general. A person that makes a payment in the course of its trade or business on behalf of another person is the payor that must make a return of information under this section with respect to that payment if the payment is described in paragraph (a) of this section and, under all the facts and circumstances, that person—[¶] (i) Performs management or oversight functions in connection with the payment (this would exclude, for example, a person who performs mere administrative or ministerial functions such as writing checks at another's direction); or [¶] (ii) Has a significant economic interest in the payment (i.e., an economic interest that would be compromised if the payment were not made, such as by creation of a mechanic's lien on property to which the payment relates, or a loss of collateral). . . ."

Jones-Williams proffered a "statement of law" and "analysis" supporting her position that rent payments made by the County on behalf of GA recipients are subject to the reporting requirement. She also repeatedly stated that the County performs management and oversight functions in connection with its payments to landlords. For example, the letter states: "Direct payments made to the welfare recipients' landlords by the County represent gross income to the landlords. The County performs management or oversight functions in connection with payments to the landlords, and the County is required to file an information return with the Service and to furnish an information statement to the landlord on Form 1099-MISC."

The December 2009 private ruling was prepared by a "Senior Technician Reviewer" employed by the IRS. The very brief letter states, in part: "Under the facts provided, it appears that the County exercises management or oversight functions with respect to payments made to landlords on behalf of the Program recipients. . . . [¶] Accordingly, if the County makes a direct payment to a landlord pursuant to the Program, the County is required to file an information return with the Service and to furnish an information statement to the landlord."

The December 2009 private ruling expressly states that the rulings contained therein are based on information and representations submitted by the taxpayer which have not been independently verified by the IRS. The letter also expressly states that the private ruling may not be used or cited as precedent.

At the December 14 hearing on the petition for writ of mandate, the parties and the court spent significant time discussing whether the section 6041(a) reporting requirement applies to the vendor landlord payments. County counsel conceded that, if there is no IRS reporting obligation, the W-9 policy is "likely" arbitrary and capricious. At the conclusion of the hearing, after the court granted the petition for writ of mandate, it made an express finding that the section 6041(a) reporting requirement does not apply to landlord vendor payments because the Agency does not perform any management function in connection with those payments.

b. *Analysis*

The County challenges the trial court's *factual* determination that Agency employees do not perform management functions in connection with the landlord vendor payments. (See 67 Fed.Reg. 48754 (July 26, 2002) ["The determination of whether a person performs management or oversight functions with respect to a payment made on behalf of another, or has a significant economic interest in connection with such payment, is a factual

one. Whether an agent has a reporting obligation under these standards must, therefore, be determined in each instance based on the particular facts and circumstances."].)

We hold that the trial court's finding is supported by substantial evidence which is summarized in the December 23, 2009, order, as follows: "Under all of the facts and circumstances of this case, the Agency does not substantially manage, oversee, or supervise GA recipients' landlords or the rental property or lease conditions or anything else. It does not inspect the premises or otherwise verify that the premises are safe, lawfully rentable, or in compliance with building codes, rent control requirements, or the warranty of habitability. It does not withhold the rent payment if a landlord is in breach of the lease.

"Recipients must make periodic reports to the Agency to verify their continuing eligibility; this is independent of any dealings between the Agency and GA recipients' landlords. Agency employees may initially check the Landlord Statement to confirm such matters as the recipient's residence in the County and that the rent does not exceed the grant, both of which are basic requirements for GA eligibility. Without eligibility the question of rent payments does not even arise. Once the Agency has determined the eligibility of the GA recipient, his address, the rent amount, and his landlord's name and address, the issuance of rent payments involves no substantial exercise of discretion and is clearly ministerial rather than managerial."

The County does not dispute any of these facts, most of which were expressly confirmed by Agency Director Yolanda Baldovinos during her deposition in this case.[10] Instead, the County contends that the trial court overlooked an allegedly key fact, which is that Agency employees "also confirm the legal standing of the person who is signing as the recipient's landlord." In its appellate brief, the County describes this function as reviewing rent or lease agreements and making an independent determination as to whether this documentation "satisfactorily confirms the legal standing of the recipient's landlord."

First, the County fails to cite any evidence in the record which establishes that the Agency staff actually performs this function. Second, we are not persuaded by the County that this nebulous function constitutes management or oversight. To support its theory, the County relies on one of the 10

---

[10] Baldovinos testified that, aside from the fact that the Agency requires submission of a landlord statement, the Agency is "not involved in supervising landlords." It does not, she said, supervise the relationship between the landlord and the GA recipient, nor does it oversee whether the tenancy complies with the warranty of habitability requirements or whether the premises comply with the building code or if they are physically safe.

"management or oversight" examples provided by the IRS in the regulation itself. (26 C.F.R. § 1.6041-1(e)(5) (2011).) Each example contains a set of hypothetical facts and a conclusion as to whether those facts support a finding that the payor engaged in "management or oversight."

The County relies on example 9 which describes a scenario in which a medical insurer who administers a state health care program makes payments to health care providers on behalf of insured patients. In that situation, the payor reviews the claim submitted by the patient or provider, determines if the claim meets the requirements for payment, and determines the amount of the payment to be made to the provider. The IRS regulation provides that the payor in this scenario performs management or oversight functions and must comply with the section 6041(a) reporting .requirement. (26 C.F.R. § 1.6041-1(e)(5) (2011).)

According to the County, the "facts in Example 9 are indistinguishable from our facts." We are not persuaded that this analogy holds true. Indeed, the County ignores even the most obvious distinction between the present case and example 9, which is that the County does not determine the amount of the payment to a GA recipient's landlord. Beyond that, it seems obvious to us that the one-time review of a landlord statement in order to confirm that there is a legal landlord-tenant relationship is not substantively analogous to a medical insurer's intensely individualized assessment of each medical claim submitted on behalf of an insured patient.

The County also argues that the trial court "incorrectly interpreted the Middleman Rule to require a higher threshold of management authority than required by the IRS regulation." According to the County, the IRS intended for the Middleman exception to be construed very narrowly and to cover only those situations in which payments are made "at the direction of another person." The County fails to cite any authority supportive of this theory. In any event, the County's narrow interpretation of the Middleman exception is inconsistent with the language of the regulation itself, which states that "writing checks at another's direction" is just one example of an "administrative or ministerial" function which does not amount to management or oversight. (See fn. 9, *ante*.)

Unable to identify any actual evidence that the Agency performs a management or oversight function, the County characterizes the December 2009 private ruling as compelling evidence that the Agency performs a management function in connection with the landlord payments and then argues that the trial court erred by refusing to defer to the IRS. This argument is legally and factually erroneous.

Private letter rulings "may not be used or cited as precedent." (26 U.S.C. § 6110(k)(3); see also *Vons Companies, Inc. v. U.S.* (2001) 51 Fed.Cl. 1, 12, and authority cited therein.) Indeed, the December 2009 private ruling expressly states that "[t]his ruling is directed only to the taxpayer requesting it. Section 6110(k)(3) of the Code provides that it may not be used or cited as precedent."

Amici curiae, the California Tax Reform Association and the Asian Law Alliance, highlight the importance of this rule. They point out, among other things, that the private letter ruling is a "rapid and tentative response from the IRS to a taxpayer request for the IRS's blessing of the taxpayer's desired tax treatment." (Citing Saltzman, IRS Practice and Procedure (rev. 2d ed. 2005) ¶ 3.03[3][b].) In addition, before the IRS issues a ruling which is adverse to the taxpayer, it gives that taxpayer the opportunity to withdraw the letter ruling request. (See Rev. Proc. 2010-1, 2010-1 I.R.B. 1, § 8.06.) Finally, and perhaps most important for the purpose of our analysis, the private letter ruling is based on factual information provided by the taxpayer which is not independently verified by the IRS.

In the present case, the IRS relied on the factual representations made by Malinda Jones-Williams, including, in particular, the representation that the Agency performs management and oversight functions in connection with the landlord vendor payments. The County has not identified, nor have we found, any evidence in the record to support this representation. On the other hand, there is substantial evidence to support the trial court's express finding that Ms. Jones-Williams's representation to the IRS that the Agency performs a management and oversight function is "untrue." During her deposition in this case, Jones-Williams testified that she did not have any knowledge as to whether the Agency performs any management or oversight function with respect to landlord vendor payments.

Many other circumstances in this case reinforce our conclusion that the December 2009 private ruling is simply not relevant to the issue at hand. The Private Letter Ruling Request, which was the only source of factual information provided to the IRS, did not convey any of the relevant facts which led the trial court to conclude that the Agency does not perform a management function. Furthermore, the ruling Ms. Jones-Williams sought was, in essence, an adverse ruling in that she asked the IRS to find that the County was subject to a reporting requirement. Thus, by making an express representation that the Agency "is performing management and oversight functions in connection with a payment to a landlord," Jones-Williams essentially dictated her own response and undermined the potential value of an objective

determination by the IRS. Finally, the very brief private letter ruling that the IRS issued does not contain any analysis or reasoning and does not even provide a definitive response, but ultimately concludes only that "it appears that the County exercises management or oversight functions with respect to payments made to landlords."

For all these reasons, we affirm the trial court's finding that the Agency does not perform a management or oversight function in connection with vendor payments to landlords of GA recipients.

At oral argument before this court, County counsel argued that, even if the Agency does not perform a management or oversight function, the trial court committed reversible error by finding that the Middleman exception to the reporting requirement applies to these payments. Characterizing the Middleman exception as a red herring, counsel maintained that 26 Code of Federal Regulations part 1.6041-1 (2011) does not apply in this case at all because vendor rent payments are not made on behalf of another person within the meaning of this regulation.

Not only did the County fail to make this claim in the trial court, but it essentially conceded below that vendor rent payments are made on behalf of the GA recipient. Furthermore, the County did not make this claim in its appellants' opening brief or its appellants' reply brief. Beyond that, when the County first proposed this new theory, in a response to an amicus curiae brief that was filed less than a week before oral argument, it did not offer sound reasoning, relevant legal authority or, indeed, any explanation, for its failure to raise this issue in a timely fashion. Under these circumstances, this new theory is waived. (*McDonald's Corp. v. Board of Supervisors* (1998) 63 Cal.App.4th 612, 618 [74 Cal.Rptr.2d 101]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 8:229 et seq., p. 8-155 et seq. (rev. # 1, 2009), and cases cited therein.)[11]

## V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[11] We are very concerned that this new theory appears to be part of a questionable litigation strategy. From the moment respondents filed their writ petition, the County has apparently been devising "after the fact" justifications for its W-9 policy in a misguided attempt to avoid having to address the actual consequences of that policy. This court is not an appropriate forum for such gamesmanship.

*See footnote, *ante*, page 826.

## VII. DISPOSITION

The judgment is affirmed.

Kline, P. J., and Richman, J., concurred.